**STATE of Iowa, Appellee,**

v.

**John ROMEO, Sr., Appellant.**

No. 94–1371.

Supreme Court of Iowa.

Jan. 17, 1996.

Considered by LARSON, P.J., and CARTER, NEUMAN, ANDREASEN, and TERNUS, JJ.

TERNUS, Justice.

Attorney John Romeo, Sr., defendant, appeals from judgment of conviction and sentence on two counts of tampering with records. *See* Iowa Code § 715A.5 (1993). His conviction arises from the preparation of two receipts to document his client's "purchase" of two stolen skid loaders. The State claimed that Romeo falsified these receipts to protect his client from criminal charges. The jury agreed.

On appeal Romeo raises three issues: (1) the evidence is insufficient to support the jury's verdict and therefore, the trial court erred in overruling his motion for judgment of acquittal; (2) the trial court also erred in denying his motion for new trial because the State failed to produce tape recordings of conversations between the State's witnesses and authorities; and (3) Romeo was denied his right to a fair trial by the prosecutor's improper remarks during closing argument. We find substantial evidence supports Romeo's conviction. We also conclude that Romeo is not entitled to a new trial because the undiscovered tapes would not have changed the result of his trial and do not undermine our confidence in the jury's verdict. Finally, we hold Romeo failed to preserve error with respect to the prosecutor's closing argument. Therefore, we affirm.

### I. *Sufficiency of the Evidence.*

A. *Scope of review.* In reviewing the sufficiency of the evidence, we are bound by the jury's finding of guilt unless we conclude the record lacks substantial evidence to support such a finding. *State v. Bush,* 518 N.W.2d 778, 779 (Iowa 1994). In deciding whether substantial evidence supports a conviction, we view the evidence in the light most favorable to the State, making any legitimate inferences that may fairly and reasonably be deduced from the evidence. *State v. Moore,* 529 N.W.2d 264, 265 (Iowa 1995). Evidence is substantial if it is sufficient to convince a rational fact finder that the defendant is guilty beyond a reasonable doubt.

D. William Thomas of Parrish, Kruidenier, Moss, Dunn, Montgomery & Thomas, Des Moines, for appellant.

Thomas J. Miller, Attorney General, Susan M. Crawford and Douglas Marek, Assistant Attorneys General, and John P. Sarcone, County Attorney, for appellee.

*Id.* Direct and circumstantial evidence are equally probative. *State v. Parrish*, 502 N.W.2d 1, 3 (Iowa 1993).

B. *Record evidence.* Viewing the evidence in the light most favorable to the jury's finding of guilt, we believe the record shows the following facts. Kevin Schneider, a detective with the Polk County sheriff's office, and Steven Ponsetto, an agent with the Iowa Division of Criminal Investigation, were assigned to investigate a theft ring operating in Iowa. Their investigation included the theft of a 1991 model skid loader in Des Moines on April 23, 1993, and a 1992 model skid loader in Victor on April 24, 1993. These skid loaders had been stolen by Kevin Sonderleiter, Robert Hirsch and Daniel Brown.

A week after the skid loaders were stolen, these three men were caught in an attempted theft in Osceola. Brown was apprehended; he implicated Sonderleiter and Hirsch. The police also discovered that Hirsch had rented the truck involved in the Osceola theft. The authorities tracked Sonderleiter and Hirsch across three states and finally arrested them on June 12, 1993.

On May 17, 1993, during the course of their investigation, the police recovered the 1991 skid loader from Joseph Paulson in Council Bluffs. Paulson agreed to call the person from whom he bought the skid loader—Frank Bode. Paulson spoke with Bode two days later and their conversation was recorded by the police. Paulson told Bode that the police had recovered the 1991 skid loader; Bode said that his attorney, John Romeo, had a sales receipt for the skid loader.

The testimony at trial showed that the sales receipt to which Bode referred had been prepared the day before, on May 18, 1993. On that date at approximately nine in the evening, Romeo met his client, Frank Bode, Sonderleiter and Hirsch at Romeo's office. A female friend of Bode was also present outside Romeo's office. Sonderleiter and Hirsch testified that the meeting was motivated by the police's recovery of the 1991 skid loader. Hirsch testified that Romeo told them Bode was on probation and Romeo wanted a "solution to get the heat off of his client." All four men discussed how to cover up Bode's role in selling the stolen equipment and they arrived at a plan to make false receipts.

Romeo then drafted a receipt on his word processor. The form contained an assurance: "This property that is the subject of this Sales Receipt is sold with the express understanding and seller's assurance that said property is not stolen, borrowed, or of otherwise questionable ownership." Bode filled in two forms, describing the property sold; Sonderleiter and Hirsch signed their names and social security numbers. Sonderleiter and Hirsch said they signed the receipts because they were already wanted by the police for other thefts so they had nothing to lose.

The receipts indicated a purchase price of $5400 for the 1991 model and a purchase price of $6000 for the 1992 model even though Bode paid only $5000 for both. Each machine was worth substantially more than the listed purchase price. The forms also contained blank lines for a witness's signature and for the date. These lines were not completed the night the thieves signed the receipts.

On July 5, 1993, detective Schneider attempted to speak to Bode and was referred to his attorney, Romeo. Schneider contacted Romeo the next day; Romeo told Schneider that he had a receipt for the skid loaders and would give it to Schneider on July 7th. On July 6, 1993, Jodi O'Neal stopped by Romeo's office to inquire about some work Romeo was doing for her. Romeo asked her to sign the receipt for the 1991 skid loader as a witness, telling her she would be doing the police a favor by helping them catch the thieves. She signed the receipt; it was undated at that time.

On the morning of July 7, 1993, Romeo gave the receipt for the 1991 skid loader, now signed by a witness, to Schneider. Romeo assured Schneider that he had only one receipt and that his client had not purchased anything else from Hirsch and Sonderleiter. Schneider noticed that the receipt was dated April 22, 1993, the day before the skid loader was stolen. Romeo confirmed for Schneider that he had prepared the receipt for Bode on

April 22 and that O'Neal had witnessed it that night.[1]

Schneider called O'Neal at work that same day. O'Neal told Schneider that she signed the receipt on April 22; she agreed to talk with Schneider in person after lunch. O'Neal was upset after this conversation and called Romeo. Romeo was not in so she left a message on his answering machine telling him that the police were questioning her about the receipt. When O'Neal talked to Schneider that afternoon, she told him what had really happened.

Later on July 7th the police obtained a search warrant for Romeo's office and executed it the next day. The police seized Romeo's file on Bode which included the receipt for the 1992 skid loader and an undated handwritten note showing that at some point in time Romeo knew the skid loaders were stolen.[2] Romeo's appointment book was also seized. Romeo submitted into evidence the entry from July 7, 1993:

> Gave Kevin Schneider copy of Sales Receipt that Kevin Sonderleiter and Robert Hirsch signed.... Ms. O'Neal signed as witness at my request last evening.... This was necessary in case they talk to these a* * * * * * * (Thiefs) they will assume someone else saw them do so and won't deny their signatures of that evening. Told Kevin she was a client (Dissolution) of mine and I asked her to sign it! I trust he understood that she did *not* actually witness them signing. They

would not have known that the female here was not Ms. O'Neal so it should keep them on guard about denying their signatures. We will see how this action influenced their truthfulness! Now I know these b* * * * * * * are thiefs!!

The note does not state that it was written on July 7th. Even if it was written on that date, it may have been prepared after Romeo received O'Neal's message.

Romeo's appointment book showed that he attended a legal education seminar on April 22, 1993, the date he claimed he prepared the receipts. Although entries on other dates are detailed and show calls received at night, there is no entry on April 22 showing that Romeo met or talked with Bode. There is an entry on May 18, 1993, showing that Romeo met with Bode on a matter unrelated to the receipts.

C. *Support for guilty verdict.* Iowa Code section 715A.5 (1993) defines the offense of tampering with a record:

> A person commits an aggravated misdemeanor if, knowing that the person has no privilege to do so, the person falsifies, destroys, removes, or conceals a writing or record, with the intent to deceive or injure anyone or to conceal any wrongdoing.

Romeo claims the evidence is insufficient to prove the elements of this crime beyond a reasonable doubt. Specifically, he asserts that he is protected by the attorney/client privilege, that he did not falsify a document

---

1. In a written statement given to police on July 8, 1993, Romeo again asserted that the receipt was prepared on April 22, 1993.

2. The note contained the following information:

Frank Bode—244–6791

Mike Paulson—Council Bluffs (712–322–2000)

Joe Paulson *----------Bought 2 stolen skid-loaders and sold one and kept one ...

Police only know about one loader.

Kevin—Dan Clay Brown?

Possible— Dump truck basis of conversations at approximately the same time as the Paulsons were purchasing the skid loaders

Obtain a receipt for skid loaders from the actual thieves.

1991—Model 1845–C CASE SKID LOADER
PostHole Driver
Bucket
$22,000 ... New
1st Degree—$44,000

The names of Sonderleiter and Hirsch and their social security numbers were written on the back of the note. Schneider testified that *"1st Degree—$44,000"* likely meant first degree theft as a probable charge for two skid loaders worth $22,000 each.

because he merely printed the blank form, and that he had no intent to deceive anyone or to conceal any wrongdoing. We address each contention separately.

■ 1. *Privilege to falsify.* Romeo contends there is no evidence that he did anything other than advise Bode not to purchase the skid loaders from Sonderleiter and Hirsch unless they were willing to sign a receipt stating the items were not stolen, and that he gave Bode blank receipts for this purpose. Romeo claims these actions fall within the attorney/client privilege. However, we conclude sufficient evidence was introduced at trial to support the jury's finding that Romeo knew he was not operating under a privilege when he took these actions.

■ First of all, we assume for purposes of our consideration of Romeo's argument that his action in preparing the blank receipts falls within the attorney/client privilege. Nonetheless, even where the requirements for the existence of the privilege are present, it may be lost if the confidential communications are made in the presence of third persons. *State v. Deases,* 518 N.W.2d 784, 787 (Iowa 1994); *State v. Tornquist,* 254 Iowa 1135, 1155, 120 N.W.2d 483, 495 (1963). Here Romeo's actions and advice occurred in the presence of Sonderleiter and Hirsch. Therefore, there is sufficient evidence to support a finding that Romeo, an attorney, knew that his communications were not privileged.

■ 2. *Acts constituting "falsification."* Romeo's second argument is that there is insufficient evidence that he *falsified* the sales receipts.[3] He contends that falsifying a receipt requires more than merely supplying a blank form.[4]

■ The legislature did not define the term "falsifies." Therefore, we assume the legislature intended the word to have its common and ordinary meaning. *Bush,* 518 N.W.2d at 780. The dictionary defines "falsify": "to prove false; to prove false so as

legally to avoid, defeat or rectify; to make false by mutilation or addition: tamper with; counterfeit, forge, adulterate." *Webster's Third New Int'l Dictionary* 820 (1993). Black's Law Dictionary provides a similar definition: "to counterfeit or forge; to make something false; to give a false appearance to anything . . .; to tamper with, as to falsify a record or document." *Black's Law Dictionary* 603 (6th ed. 1990); *cf. State v. Groff,* 323 N.W.2d 204, 210 (Iowa 1982) (defining the term "false" for purposes of determining probable cause as a statement that "misleads").

Romeo does not dispute that the completed receipts were false documents. We think his creation of the blank receipts was the initial step in counterfeiting these sales documents. Therefore, his act satisfies both the ordinary and legal definitions of "falsify."

In an analogous case, a defendant argued that the crime of making forged checks did not include stealing blank checks which he later gave to counterfeiters. *United States v. Delia,* 944 F.2d 1010, 1014 (2d Cir.1991). The court held that the "making" of a forged check did not consist solely of the actual forgery of the check. *Id.* It included "the first and essential step[ ] in the fraudulent scheme": the acquisition of the blank checks. *Id.*

Similarly, here the creation of the blank receipts was an essential ingredient in falsifying the sales documents. Therefore, Romeo's action in producing the blank forms falls within the prohibition of section 715A.5, provided the other elements of the crime are present.

■ 3. *Mental state necessary to "falsify."* Romeo asserts that to falsify a writing one must do more than create something shown to be untrue; there must be knowledge of untruth. "Ordinarily one is not guilty of a crime unless he is aware of the existence of all those facts which make his

---

3. We discuss only the alternative of this offense with which Romeo was charged: falsification of a writing or record.

4. Romeo asserts that his act in obtaining O'Neal's signature cannot support the falsification element of the offense for the count based on

the receipt for the 1992 skid loader because O'Neal only signed the receipt for the 1991 skid loader. We accept for purposes of our analysis that neither the witness signature nor the dates, which were arguably entered by Romeo, formed the basis for his conviction.

conduct criminal." 21 Am.Jur.2d *Criminal Law* § 136, at 270 (1981). The elements of the crime of falsifying a record are consistent with this general principle. Section 715A.5 requires that the defendant's act of falsifying be done "with the intent to deceive or injure anyone or to conceal any wrongdoing." Thus, it is inherent in the statute that the defendant act with knowledge of the falsity rather than innocently or accidentally; otherwise, there could be no finding that the defendant had the specific intent to deceive or conceal. Therefore, Romeo is correct in arguing that falsification, within the meaning of section 715A.5, occurs only when the defendant knows the writing or record is untrue.

Our examination of the record reveals abundant evidence to support a finding that Romeo knew that the receipts he participated in preparing were false. First, Sonderleiter and Hirsch testified that Romeo knew the skid loaders were stolen when he prepared the blank receipts. Although Romeo argues that their testimony was too self-serving and contradictory to be credible, we disagree.

■ Both Sonderleiter and Hirsch agreed to testify only after the authorities promised they would not be charged with any thefts in Polk County. The existence of this agreement does not make their testimony inadmissible; rather it goes to the credibility of their testimony and the weight to be given to it. *State v. McGonigle*, 401 N.W.2d 39, 41 (Iowa 1987); *accord United States v. Starcevic*, 956 F.2d 181, 184 (8th Cir.1992) ("Generally, plea agreements and the like are relevant to impeachability, not admissibility."). It was for the jury to determine whether the concessions received by these witnesses from the State in exchange for their testimony undermined their credibility. *State v. Robinson*, 288 N.W.2d 337, 341 (Iowa 1980) (jurors judge the credibility of witnesses). Similarly, it was for the jury to judge the effect of any inconsistencies between the testimony of Sonderleiter and Hirsch. We merely observe that any inconsistencies related to minor details; none of the differences suggests "that the essence of [their] testimony is untrue." *Starcevic*, 956 F.2d at 184 (finding

testimony was not so inconsistent as to lack credibility as a matter of law).

We also note that Sonderleiter's and Hirsch's testimony is supported by other evidence. The undated, handwritten note from Romeo's file on Bode provides such corroboration: "Obtain a receipt for skid loaders from the actual thieves." The same note also states *"1st Degree—$44,000"* and indicates that Joe Paulson purchased the stolen skid loaders from Bode. This note could have been viewed by the jury as a statement of Romeo's plan to falsely document the transfer of the skid loaders from the thieves to Bode to protect his client from first-degree theft charges.

Romeo points to the July 7, 1993, entry in his appointment book as evidence that he did not know the skid loaders were stolen when he printed the receipts. However, the jury could have concluded from the evidence that this entry was prepared after Jodi O'Neal's call to Romeo, which alerted him to the fact that the police were focusing on the authenticity of the receipt. The jury may have believed that Romeo wrote the note in his appointment book to create evidence in support of his fabricated story that he innocently participated in the preparation of the receipts.

Finally, Romeo argues that the State's theory that Sonderleiter and Hirsch would sign receipts to protect Bode was illogical. Romeo contends the only plausible explanation for Sonderleiter's and Hirsch's actions is that they were trying to convince Romeo and Bode that they were lawful owners of the skid loaders. However, the sequence of events shows that by May 18, 1993, when the jury could have concluded the receipts were prepared, the police had already identified Sonderleiter and Hirsch as thieves and were pursuing them across several states. Therefore, the thieves had nothing to lose when they signed the receipts.

■ 4. *Intent to deceive or conceal.* The same evidence supports the jury's conclusion that Romeo acted with an intent to deceive someone or to conceal wrongdoing. This intent may be shown by circumstantial evidence and the reasonable inferences drawn from that evidence. *State v. Nance,*

533 N.W.2d 557, 562 (Iowa 1995); *accord United States v. Brown,* 763 F.2d 984, 989 (8th Cir.), *cert. denied,* 474 U.S. 905, 106 S.Ct. 273, 88 L.Ed.2d 234 (1985) (discussing intent to defraud). The jury could easily infer from Romeo's knowledge that the skid loaders were stolen, that he intended to deceive authorities or conceal his client's wrongdoing by printing blank receipt forms for Sonderleiter and Hirsch to sign. This inference is further bolstered by other evidence: Romeo's conduct in having O'Neal falsely witness one of the receipts; Romeo's misrepresentation to Schneider that his client had not purchased anything from Sonderleiter and Hirsch other than the 1991 skid loader the police had already recovered; Romeo's assertions that the receipts were prepared on April 22, 1993, before the skid loaders were even stolen; and Romeo's failure to document his meeting with Bode, Sonderleiter, and Hirsch when it was normally his practice to record such events.

In light of the physical evidence in this case, the testimony of Sonderleiter and Hirsch, the circumstances surrounding Romeo's actions and the reasonable inferences which the jury could draw, we conclude there was substantial evidence for the jury to find Romeo guilty of tampering with records. The trial court did not err in denying Romeo's motion for judgment of acquittal.

## II. *State's Failure to Produce Tape Recordings.*

Romeo seeks a new trial on the basis of the State's failure to produce tape recordings of conversations between Sonderleiter, Hirsch and law enforcement authorities. He claims that the State's failure to produce these tapes violates his rights under Iowa Rule of Criminal Procedure 23(2)(b)(8) and under the Due Process Clause of the Fourteenth Amendment of the United States Constitution. We conclude Romeo is not entitled to a new trial because (1) the evidence withheld from him would not have changed the outcome of his trial as required for a rule 23 violation, and (2) the due process requirement that the absence of the evidence undermine our confidence in the jury's verdict is not present.

In December 1993, the State provided copies of all statements or summaries of statements of the State's witnesses to Romeo's attorney in response to a request by him for those documents. Three months later, an assistant Polk County attorney not assigned to Romeo's case, Schneider and Ponsetto interviewed Sonderleiter and Hirsch to obtain information from them pertaining to stolen property that had surfaced in other cases. These interviews were tape recorded. During the interviews there was an informal discussion about the terms of a plea agreement. The assistant Polk County attorney indicated he would not charge the thieves with any offenses in Polk County and no habitual offender charges would be filed if Sonderleiter and Hirsch provided the requested information.

Two weeks after the interviews, Romeo's attorney deposed Sonderleiter. Sonderleiter revealed that as part of his agreement to testify in Romeo's case, the Polk County attorney would not file any charges against him in Polk County. He acknowledged that the Polk County charges could have totaled nearly 200 years of prison time. After the completion of trial but before sentencing, Romeo's attorney learned of the existence of the tapes when they were produced in another case.

■ A. *Iowa Rule of Criminal Procedure 23(2)(b)(8).* Rule 23(2)(b)(8) permits the court to grant a new trial

[w]hen the defendant has discovered important and material evidence in his or her favor since the verdict, which the defendant could not with reasonable diligence have discovered and produced at the trial.

Romeo must show (1) he discovered the tape recordings after the verdict, (2) he could not have discovered them earlier in the exercise of reasonable diligence, (3) the recordings are material to the issues in the case and not merely cumulative or impeaching, and (4) the evidence probably would have changed the result of the trial. *See State v. Allen,* 348 N.W.2d 243, 246 (Iowa 1984).

■ The trial judge concluded that the tapes were not material and would not have affected the outcome of the trial. Because

the trial judge sat through the trial, he is in a superior position to decide whether the information on the tapes would have changed the result of the trial. Consequently, we give weight to his conclusion that the result would not have been altered had the tapes been available for use at trial. *Id.; State v. Jackson*, 223 N.W.2d 229, 233 (Iowa 1974). Therefore, we review the trial court's ruling on a motion for new trial on the basis of newly-discovered evidence for an abuse of discretion. *Jackson*, 223 N.W.2d at 233.

■ Romeo argues that the tapes would have allowed him to impeach the credibility of Sonderleiter and Hirsch at trial. However, during the testimony of both witnesses, the prosecutor brought out the fact that they were testifying with the understanding that if they cooperated with the authorities, they would not be charged with crimes in Polk County. Sonderleiter testified that he faced twenty to thirty theft charges in Polk County with the possibility of almost 200 years in prison. He also stated that he would not be charged with crimes in other counties that might have resulted in another 100 years in sentences. Hirsch admitted that he would not be prosecuted on any charges in Polk County and additionally, that he would not be tried as a habitual offender.

The only information contained on the tapes that was not brought out at trial was the fact that the authorities had also agreed not to charge Sonderleiter as a habitual offender. We are unable to conclude that the trial court abused its discretion by deciding this additional fact would not have affected the outcome of the trial. The jury knew that Sonderleiter agreed to testify in exchange for 300 years of charges being dropped. Any additional motivation to fabricate that might have arisen from the prosecutor's agreement to abandon any habitual offender charges was de minimis. In other words, if the jury found Sonderleiter credible despite the fact that he would not be prosecuted for 300 years worth of crimes, the jury certainly would not have had a different opinion of his credibility merely because the concessions were somewhat greater than the 300 years to which Sonderleiter admitted.

We agree with the trial court that the result of the trial would not have been altered had the State produced the tapes. The trial court did not abuse its discretion in denying Romeo's motion for new trial under rule 23(2)(b)(8).

■ B. *Due process claim.* A defendant's due process rights are violated when the prosecution fails to produce upon request evidence favorable to the accused "where the evidence is material either to guilt or punishment." *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215, 218 (1963). Evidence that may be used to impeach a witness's credibility is included in this rule. *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481, 490 (1985). The good faith or bad faith of the prosecution in failing to produce the evidence is unimportant in deciding whether a defendant's due process rights have been infringed. *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196–97, 10 L.Ed.2d at 218.

■ To establish a *Brady* violation, Romeo must prove (1) the prosecution suppressed the tapes, (2) the tapes were favorable to his defense, and (3) the tapes were material to the issue of guilt. *See Cornell v. State*, 430 N.W.2d 384, 385 (Iowa 1988). The trial court found that the tapes were not material. We review this constitutional issue de novo, *Brewer v. State*, 444 N.W.2d 77, 80 (Iowa 1989), and find that Romeo failed to satisfy the materiality element of this test.

■ Whether the evidence was material depends on whether "there is a reasonable probability that … the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3384, 87 L.Ed.2d at 494. A "reasonable probability" of a different result is shown "when the Government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles v. Whitley*, 514 U.S. ——, ——, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490, 506 (1995) (quoting *Bagley*, 473 U.S. at 678, 105 S.Ct. at 3381, 87 L.Ed.2d at 491). The defendant need not show that the disclosure of the suppressed evidence would have resulted in his acquittal. *Id.* Thus, we must decide whether the fact that Sonderleiter

would not be charged as a habitual offender so impeaches his testimony as to undermine our confidence in the jury verdict.

■ Upon our review of the record and the suppressed evidence, we find no reasonable probability that the result of Romeo's trial would have been different if the tapes had been disclosed prior to trial. Romeo's counsel knew that Sonderleiter and Hirsch were testifying under an agreement with the prosecuting authorities and he cross-examined them on this point at trial. Although Romeo's attorney was unaware that Sonderleiter would not be prosecuted as a habitual offender, we do not think knowledge of this fact would have changed his trial preparation or strategy.

Moreover, as we concluded in our discussion of Romeo's rule 23 claim, the impeachment value of this evidence was merely incremental. Even if Romeo's counsel had brought out the habitual offender aspect of Sonderleiter's deal with the government, we do not believe it is reasonably probable that this fact would have changed the jury's evaluation of Sonderleiter's credibility. *See United States v. Petrillo*, 821 F.2d 85, 90 (2d Cir.1987) (no due process claim where the impeachment information not supplied to the defendant was already, in substance, before the jury); *Skinner v. Cardwell*, 564 F.2d 1381, 1386 (9th Cir.1977), *cert. denied*, 435 U.S. 1009, 98 S.Ct. 1883, 56 L.Ed.2d 392 (1978) (where defense knew of basic content of plea agreement with prosecution's star witness before trial, "[k]nowledge of the precise details of the agreement was unlikely to add significantly to its impeachment potential"); *Rowe v. Grizzard*, 591 F.Supp. 389, 397 (E.D.Va.1984) (if suppressed impeachment evidence would have had no significant effect on the witness's credibility, there is no due process violation); *Brewer*, 444 N.W.2d at 83 (failure of prosecution to reveal complete details of star witness's grant of immunity was not a *Brady* violation in part because the evidence was not material).

Therefore, the suppression of this evidence does not raise a "reasonable probability" that the result of the trial would have been different.

For these reasons, our confidence in the correctness of the jury's verdict is not undermined by the suppression of evidence by the State. Therefore, the evidence Romeo claims was suppressed is not material and consequently, his due process right to a fair trial was not infringed.

### III. *Prosecutorial Misconduct.*

Romeo claims he was denied a fair trial under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and article I, sections nine and ten of the Iowa Constitution. He bases this claim on statements made by the prosecutor during his closing argument. The State argues that error was not preserved on this claim and we agree.

■ There are two requirements to obtain relief on the basis of misconduct in closing arguments. First, the defendant must make a timely and proper objection to the offending argument. *State v. Love*, 302 N.W.2d 115, 121 (Iowa 1981); *State v. Horsey*, 180 N.W.2d 459, 460 (Iowa 1970). Unless objection is made at the time of the argument, the defendant has waived his right to complain. *Love*, 302 N.W.2d at 121.[5] Second, there must be some record of the argument so the appellate court has something to review. *Horsey*, 180 N.W.2d at 460. We need address only the first of these requirements.

■ Romeo's counsel raised the issue of the prosecutor's allegedly improper remarks for the first time in a motion for new trial. However, a motion for new trial is not a substitute for objecting at the time of the offending conduct. *State v. Emery*, 230 N.W.2d 521, 525 (Iowa 1975); *State v. Rutledge*, 243 Iowa 179, 199, 47 N.W.2d 251, 264

---

5. It is not always essential that opposing counsel interrupt closing argument with an objection:

> Where closing arguments are reported, certified and made a part of the record, objections to remarks of counsel during final argument are timely if urged at close of argument and in a motion for mistrial made before submission to the jury.

*State v. Nelson*, 234 N.W.2d 368, 371 (Iowa 1975). Here the arguments were not reported and no objection appears of record before the case was submitted to the jury.

(1952). Therefore, Romeo's motion for new trial was not a timely objection and error was not preserved.

AFFIRMED.