# IN THE COURT OF APPEALS OF IOWA

No. 24-0809
Filed August 20, 2025

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**ALLYSA MARIE LUKE, a/k/a ALLYSA MARIE JOYCE, n/k/a ALLYSA MARIE LARSON,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Cerro Gordo County, DeDra Schroeder, Judge.


        A defendant appeals her convictions for child endangerment resulting in death and child endangerment resulting in serious injury. **AFFIRMED.**


        Richard Hollis, Des Moines, for appellant.

        Brenna Bird, Attorney General, and Joshua Henry, Assistant Attorney General, for appellee.


        Considered without oral argument by Tabor, C.J., and Ahlers and Langholz, JJ.

**AHLERS, Judge.**

Allysa Luke gave birth to twin boys—A.L. and B.L.—in early December 2020. A.L. died from malnourishment on February 28, 2021. B.L. was still alive but greatly malnourished. The State charged Luke with two crimes: (1) child endangerment resulting in death as to A.L.; and (2) child endangerment resulting in serious injury as to B.L. A jury found her guilty of both crimes, and the district court sentenced her to concurrent sentences that resulted in an indeterminate prison sentence not to exceed fifty years.

Luke appeals. She raises four claims: (1) the evidence was insufficient to support the jury's verdicts on both charges; (2) the district court abused its discretion by denying her motion for new trial based on the claim that the verdict was contrary to the weight of the evidence; (3) the district court abused its discretion by denying her motion for new trial based on admission of cumulative autopsy photos; and (4) the district court abused its discretion by denying her motion for new trial based on prosecutorial misconduct during closing argument.[1] Before addressing each issue in turn, we start with some factual background.

---

[1] These are the issues we can discern from Luke's brief. Throughout her brief, Luke sprinkles references to various constitutional provisions and other issues generally related to the four issues we've identified. To the extent Luke was intending to assert additional challenges, we decline to address them because they were not preserved or are forfeited due to Luke's failure to properly identify, develop, or cite authority in support of the issues. *See State v. Jackson*, 4 N.W.3d 298, 311 (Iowa 2024) (finding a party forfeits an issue on appeal when the party fails to clearly identify it, fails to make an argument in support of it, fails to make more than a perfunctory argument in support of it, or fails to cite authority in support of it); *see also State v. Wilson*, No. 21-1287, 2022 WL 17481348, at *1 (Iowa Ct. App. Dec. 7, 2022) (declining to consider undeveloped issues sprinkled throughout a brief).

I.      **Factual Background**

The boys were born premature.  Luke took them to their physician for a one-month weight and wellness check on January 14.  Both were gaining weight and were noted to be alert, healthy, and meeting developmental milestones.  The doctor reminded Luke that she needed to follow a specified feeding schedule, and Luke assured the doctor that she was doing so.

About eleven days later, Luke began new full-time employment.  Luke's mother or aunt typically watched the twins while Luke worked.  Luke took the twins to their doctor for their two-month wellness check on February 16 and reported no concerns.  But the doctor had "moderately high" concerns because the twins had not gained sufficient weight.  In fact, A.L. had lost weight.  The doctor told Luke she needed to increase the twins' feedings. Because Luke was breastfeeding, the doctor directed her to pump her breast milk and feed from a bottle so the twins' intake could be measured.  The doctor also told Luke to supplement with formula if needed to meet the increased intake amount the doctor had set.  The doctor advised that if the twins did not meet that intake amount, they would need to be hospitalized to ensure sufficient feeding.  The doctor also offered to assist Luke with getting formula through the WIC program.[2]

When Luke contacted WIC the next day, she was told she qualified to receive funds that would provide eighteen cans of formula per month.  But Luke only purchased four of the eighteen cans she was eligible to purchase in February.

---

[2] A witness testified that WIC stands for "Women, Infants, and Children" and it is a supplemental food program designed to help with basic food needs and support for "women who are pregnant or post-partum, breastfeeding women, infants, and then children up until the age of five."

The twins' doctor was so concerned about their lack of weight gain that the doctor scheduled a follow-up appointment for February 19—only three days after the prior visit. That appointment took place by phone. During the call, Luke assured the doctor that the twins were receiving the amount of breast milk and formula that the doctor recommended. Luke expressed no concerns about the twins' health or their feeding. The doctor was "reassured by that information" and was hopeful the twins could go back to a regular feeding schedule at some point, but the doctor scheduled an expedited weight check visit for February 26. Due to an unspecified scheduling conflict, that appointment was rescheduled for March 1.

On February 28, Luke was in the process of moving from one residence to another. She and a friend were working on the move overnight from February 27 to 28, so the twins stayed with Luke's mother. Luke and the friend picked the twins up around 8:00 or 9:00 a.m. and took them to Luke's new residence. Luke left the twins in their car seats because they were sleeping. She straightened up the apartment in anticipation of a visit from a service provider affiliated with the Iowa Department of Health and Human Services. When the provider arrived, she saw the twins in their car seats but did not observe their condition because they were covered with blankets. One appeared to be asleep. After the provider left, Luke's friend ran an errand and returned. About thirty minutes after the friend returned, Luke left to deal with a situation involving her relatives and was gone for about an hour. The twins remained in their car seats.

When Luke returned, she noticed A.L. wasn't breathing. She screamed and called 911. The friend attempted CPR at the direction of the 911 operator, but A.L. was lifeless and nonresponsive.

Emergency responders arrived at 1:26 p.m. A.L. was blue or purple in color and was "limp and lifeless." One of the responders started CPR but rigor mortis had already set in, leading the responder to conclude A.L. had died before his arrival. Nevertheless, responders continued CPR and transported A.L. to the hospital, where he was determined to be dead at the time of arrival.

Law enforcement officers arrived at the residence and the hospital. Their investigation revealed that B.L. was not in good condition either. He was pale and hardly breathing. He was also cold to the touch, and his mouth was crusty and felt like "hard, dry plastic." Immediate efforts were taken to try to feed B.L., but after scouring "the entire apartment, top to bottom, every room, pull[ing] out every drawer, every cabinet in the kitchen," a baby bottle could not be found anywhere. Luke and her mother arrived while the search for a bottle was underway, and Luke couldn't produce a bottle either. B.L. was admitted to the hospital and ultimately diagnosed with severe malnutrition. Officers later searched the old residence, the new residence, Luke's vehicle, and the trash for empty formula cans, used breast-milk bags, and baby bottles, but they did not find any.

The autopsy of A.L. revealed that he had lost weight since his doctor visit on February 16. The coroner determined the cause of death to be malnourishment and the manner of death to be homicide.

Criminal charges ensued, resulting in the convictions previously described.

## II. Sufficiency of the Evidence

Luke challenges the sufficiency of the evidence supporting her convictions.[3] Our review is for correction of errors at law. *State v. Schwartz*, 7 N.W.3d 756, 763 (Iowa 2024). We do not disturb a guilty finding if it is supported by substantial evidence, which is evidence sufficient to convince a rational juror that the defendant is guilty beyond a reasonable doubt. *Id.* at 764. In making this assessment, we view the evidence "in the light most favorable to the State, including all legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence." *Id.* (cleaned up).

No objections were made to the jury instructions, so they are the law of the case for purposes of assessing Luke's sufficiency challenge. *Id.* The marshaling instruction for the charge related to the death of A.L. required the State to prove:

1. Between and including the 9th day of December, 2020, and the 28th day of February, 2021, Alyssa Luke was the parent or guardian of [A.L.].
2. [A.L.] was under the age of fourteen years.

---

[3] Although Luke partly frames her sufficiency challenge as a claim that the district court erred in denying her motion in arrest of judgment and motion for new trial, we reject that framework because sufficiency challenges cannot be raised in such motions. *See State v. Mumford*, 14 N.W.3d 346, 356 (Iowa 2024) ("A motion in arrest of judgment may not be used to challenge the sufficiency of evidence." (quoting *State v. Dallen*, 452 N.W.2d 398, 399 (Iowa 1990))); *State v. Stendrup*, 983 N.W.2d 231, 246 (Iowa 2022) (noting that the Iowa Rules of Criminal Procedure allow a defendant to request a new trial when the verdict is "contrary to law or evidence," which means "contrary to the weight of the evidence"). Sufficiency challenges cannot be made by a motion for new trial because the remedy for insufficient evidence is acquittal, not a new trial. *See State v. Ellis*, 578 N.W.2d 655, 657–58 (Iowa 1998). So, we do not address Luke's sufficiency-of-the-evidence challenge through the lens of reviewing the district court's denial of her motions in arrest of judgment or for new trial. By going to trial, Luke is permitted to challenge the sufficiency of the evidence on direct appeal notwithstanding any rulings on her motions in arrest of judgment or for new trial. *See State v. Crawford*, 972 N.W.2d 189, 202 (Iowa 2022).

3. Alyssa Luke knowingly acted in a manner that created a substantial risk to the physical health or safety of [A.L.] or Alyssa Luke willfully deprived [A.L.] of necessary food or health care, Alyssa Luke was reasonably able to provide necessary food or health care, and this deprivation substantially harmed [A.L.]'s physical health.
4. Alyssa Luke's actions resulted in the death of [A.L.].

Other than the name, the marshaling instruction for the charge related to the serious injury of B.L. was identical, except the fourth element required proof that Luke's actions resulted in serious injury rather than death.

Luke challenges the sufficiency of the evidence of the third and fourth elements of both charges. In pared-down form, she contends the evidence of these elements is insufficient because: (1) the State failed to prove that A.L. died from malnutrition caused by Luke's failure to feed him rather than from other medical conditions; (2) the State failed to prove that Luke willfully failed to properly feed the twins; (3) other people, including an in-home service provider, failed to notice that the twins were malnourished, so Luke was not alerted to the need for medical attention or increased feeding; (4) the State failed to prove that another caregiver—Luke's mother—was not responsible for the malnourishment of the twins; and (5) the inability of law enforcement officers to find evidence that the twins consumed food does not prove that Luke failed to properly feed them. We address each claim.

**A.      Other Medical Conditions.** Luke points to evidence that A.L. had pyloric stenosis and a bacterial infection. She contends the State failed to prove that these medical conditions did not contribute to A.L.'s death. But, viewed in the light most favorable to the State, a reasonable juror could conclude that A.L. died

from starvation due to Luke's failure to feed him rather than from either of the medical conditions highlighted by Luke.

As to pyloric stenosis, the State introduced evidence that a child with this condition could not reach a state of severe malnutrition without showing signs or symptoms of the condition. In particular, if a child had a clinically significant condition of pyloric stenosis, the child would vomit "every single drop that goes in them" and the vomiting would be of a projectile nature, which would result in the child being acutely ill within one or two days. Luke never reported vomiting of such a severe nature, and she acknowledged in her testimony that A.L. burped up after feedings, but never projectile-vomited. Further, no evidence was introduced that B.L. had pyloric stenosis, but he was found in an emaciated, severely malnourished state the same day A.L. died. From this evidence, a rational juror could conclude the pyloric stenosis did not cause A.L.'s death.

As to the bacterial infection—the campylobacter germ—the State introduced evidence that the infection is frequently seen in children and did not cause A.L.'s death. Such evidence indicated that the infection typically manifests through effects on the gastrointestinal system, such as diarrhea. But A.L.'s autopsy revealed that his intestines looked normal with no meaningful signs of infection, and there was no evidence of A.L. having any gastrointestinal distress. Furthermore, medical testimony was presented that the infection would not cause death by itself. Add to this the fact that B.L. was also seriously malnourished with no such infection, and a rational juror could conclude that any bacterial infection A.L. may have had did not contribute to his death.

**B.** **Failure to Properly Feed.** In support of this claim, Luke points to testimony from various witnesses that the twins appeared healthy, and the witnesses saw Luke feed them. As the State correctly notes, the State didn't have to prove that Luke failed to properly feed the twins, as the third element of the marshaling instruction would be satisfied by proof that Luke either (1) "knowingly acted in a manner that created a substantial risk to the physical health or safety of" the twins, or (2) "willfully deprived [the twins] of necessary food or *health care*." (Emphasis added.) The jury could have rationally concluded that the State met its burden on this element by proof that Luke willfully failed to obtain necessary health care given the malnourished condition of the children.

But as to the lack of feeding, jurors did not need to believe Luke's witnesses, nor did they have to conclude that Luke adequately fed the twins just because witnesses who saw Luke sporadically also saw her feed the twins during those sporadic visits. In contrast to this testimony, the State introduced testimony describing and photographic evidence showing the emaciated condition of the twins on February 28. Further, the twins' doctor was concerned about their nourishment to the extent that, just a few days before A.L.'s death, the doctor directed Luke to increase her feeding of the twins to make sure they were consuming four to five ounces of breastmilk or formula every three hours. A search of both residences, the trash, and Luke's vehicle revealed no indications of such regular feeding. Officers tried to feed B.L. immediately upon discovering his malnourished condition but could not find a baby bottle in the residence, despite scouring the whole apartment. When Luke arrived at the apartment, she couldn't produce one either. And other evidence established her failure to meet the feeding

schedule that day. Luke picked the twins up from her mother that day at about 8:00 a.m. and was told that they had been fed. Yet, by the time Luke called 911 around 1:20 p.m.—nearly five and one-half hours after picking them up from her mom—Luke had not fed them. Based on the directions from their doctor, Luke should have fed the twins at least once, if not twice, by then. From all this evidence, rational jurors could have concluded that Luke "willfully deprived [the twins] of necessary food."

**C.      Failure of Others to Notice Malnourished Condition.**   Luke contends that others saw the twins without raising any concerns about their malnourished condition, so jurors could not reasonably conclude that Luke should have noticed their condition. Those people included an in-home service provider who visited the apartment earlier in the day that A.L. died, Luke's mother, and the friend who was with her when she picked the twins up from Luke's mother. We first note that the service provider was in Luke's new apartment to check for babyproofing, not to do a wellness check on the twins, and she could not observe the twins' bodies because they were covered in blankets. But more importantly, the other people Luke identifies were not on trial. Luke was. And Luke was the twins' parent responsible for their well-being. Even if jurors were persuaded that others saw the twins and did not raise an alarm about their condition, reasonable jurors could still conclude that Luke knew about their condition and willfully failed to provide them with necessary food or health care.

**D.      Another Caregiver's Responsibility.**  Luke also contends that her mother was a regular caregiver for the twins, including on the day A.L. died, so her mother has "some responsibility" for any deficiencies in properly feeding the twins.

Whether Luke's mother bares any culpability is not an issue in this case. Luke's culpability is. Even if we assumed for the sake of argument that someone else may also be responsible, that person's culpability does not relieve Luke's.

**E.    Law Enforcement's Inability to Find Evidence of Feeding.** Luke contends that the inability of law enforcement officers to find evidence of feeding— such as empty formula bottles, used breast-milk bags, or baby bottles—does not establish that she didn't feed them. That is true. But it helps. Although jurors were not required to use this evidence to conclude Luke failed to adequately feed the twins, reasonable jurors could use this evidence to help reach that conclusion.

**F.    Conclusion as to Sufficiency of the Evidence.** Luke's arguments amount to her asking us to view the evidence in the light most favorable to her and to weigh it differently than the jury did. Of course, this is the oppositive of what the standard of review requires us to do. We are not permitted to weigh the evidence or resolve conflicts in it, and we must view it in the light most favorable to the State. *State v. Mathis*, 971 N.W.2d 514, 517, 518–19 (Iowa 2022). Applying those standards, reasonable jurors could have concluded that the State met its burden of proving all elements of the offenses beyond a reasonable doubt, so we reject Luke's sufficiency-of-the-evidence challenge.

## III.    Weight of the Evidence

It is not clear whether Luke is raising a separate issue that the district court improperly denied her motion for new trial based on her claim that the verdicts were against the greater weight of the evidence. Assuming she is, our review would be for an abuse of discretion. *See State v. Ernst*, 954 N.W.2d 50, 60 (Iowa 2021). Even giving Luke the benefit of the doubt that she properly raised this issue,

it is essentially just a repackaging of her sufficiency-of-the-evidence challenge, as Luke "fails to identify any specific evidence that preponderates so heavily in favor of acquittal that we can say the district court abused its discretion in denying h[er] motion for a new trial." *See id.* In ruling on Luke's motion for new trial, the district court addressed the credibility of witnesses and concluded "there certainly wasn't a greater weight of credible evidence that would tip against the jury verdicts. . . . [T]he weight of the evidence supported the jury verdict." We discern no abuse of the court's discretion in this ruling and reject Luke's challenge accordingly.

## IV. Denial of New Trial—Admission of Cumulative Autopsy Photos

Luke contends the district court erred by denying her motion for new trial based on admission of autopsy photos she now claims were cumulative. The State contends Luke failed to preserve error on this claim, and we agree. When the photographs at issue were offered, Luke made no objection to their admission. Luke cannot raise an evidentiary objection for the first time in a motion for new trial. As our supreme court said nearly one hundred years ago:

> A party cannot sit by and permit improper testimony to be introduced in a case without objection, and then, in the event of an adverse verdict, predicate error thereon as a ground for new trial or for reversal in this court. This would be, in effect, gambling on the result of a verdict, which cannot be tolerated.

*State v. Ostby*, 210 N.W. 934, 937 (Iowa 1926). The same holds true today. As Luke failed to preserve error on this issue, we do not address it further.

## V. Denial of New Trial—Prosecutorial Misconduct in Closing

For her final issue, Luke contends the State committed prosecutorial misconduct during closing argument by implying Luke was a liar by calling her

version of events "excuses." The State again contests error preservation, and again we agree. Luke raised no objection to the challenged comments at the time they were made during the State's closing argument. She first raised the issue in her motion for new trial. This is too late. Claims of misconduct in closing arguments must be "made at the time of the argument," or "the defendant has waived [her] right to complain." *State v. Romeo*, 542 N.W.2d 543, 552 (Iowa 1996). When the issue of alleged improper comments during closing argument is raised for the first time in a motion for a new trial, it is too late, as "a motion for new trial is not a substitute for objecting at the time of the offending conduct." *Id.* That is what happened here, so error is not preserved, and we do not address the issue further.

**VI.    Conclusion**

Luke's convictions are supported by substantial evidence. The district court did not abuse its discretion by denying Luke's motion for a new trial after concluding that the verdicts were not against the weight of the evidence. Luke's challenges based on allegedly cumulative autopsy photos and allegedly improper closing arguments by the State were not preserved for our review. Accordingly, we affirm.

**AFFIRMED.**