# IN THE SUPREME COURT OF IOWA

No. 10–0354

Filed December 9, 2011

**JOSE ANGEL AGUILERA,**

   Appellant,

vs.

**STATE OF IOWA,**

   Appellee.

---

On review from the Iowa Court of Appeals.


Appeal from the Iowa District Court for Wright County, James M. Drew, Judge.


Appellant seeks further review from the court of appeals decision affirming the denial of his second application for postconviction relief. **DECISION OF THE COURT OF APPEALS VACATED; JUDGMENT OF THE DISTRICT COURT REVERSED, AND CASE REMANDED.**


Martyn S. Elberg of Elberg Law Office, P.L.C., Eagle Grove, for appellant.


Thomas J. Miller, Attorney General, Sharon K. Hall, Assistant Attorney General, and Eric R. Simonson, County Attorney, for appellee.

**ZAGER, Justice**.

Jose Angel Aguilera was convicted of second-degree murder in 1997. In his second application for postconviction relief, Aguilera contends that he was denied due process when the prosecution failed to turn over an Iowa Division of Criminal Investigation (DCI) file containing several witness statements prior to Aguilera's initial trial. The district court found the material was suppressed and that it was favorable, but that it was not material to the issue of guilt and dismissed the application. The court of appeals affirmed, and we granted further review. For the reasons expressed below, we reverse the district court.

## I. Factual Background and Procedural History.

On August 18, 1996, Aguilera attended a party that was hosted by Salvador Guido.[1] The victim, Jesus "Jesse" Garcia, also attended, though neither had been invited. Garcia had recently moved in with Aguilera's wife, Zeidy. Guido and Lorenzo Lopez, who was also at the house that night, were the only "eyewitnesses" who testified at trial. At trial, each testified that Aguilera approached Garcia while Garcia was sitting in his Blazer. The two exchanged words and taunts, and Garcia exited the car. At that point, Aguilera pulled out a gun and shot Garcia in the chest. Although both Guido and Lopez acknowledged Garcia and Aguilera struggled over the weapon at some point, there was disagreement as to how far apart the two were when the gun went off. Guido placed the two six feet apart when the shot was fired and testified they only struggled after the shot was fired. Lopez indicated the two had struggled over the gun before or at the same time as the shot was fired.

---

[1]Guido's social security card, his resident alien card, and a few early court documents spell his name Salbador Guido. However, at trial, he was identified as Salvador Guido.

At trial, witnesses testified that Aguilera was afraid that Garcia, who had just moved in with Aguilera's wife, would attempt to kidnap Aguilera's daughter. According to their testimony, Aguilera appeared nervous and mentioned that men might be coming to harm him or take his daughter and that he needed the gun that was ultimately used to shoot Garcia for his own personal protection. Aguilera attempted to portray the shooting as either an accident, self-defense, or as a voluntary manslaughter killing, whereas the State sought a first-degree murder conviction.

In December 1996, a jury found Aguilera guilty of second-degree murder, and the trial court imposed sentence in January 1997. The conviction and sentence were affirmed by the court of appeals in 1998. Aguilera filed a postconviction relief application based on alleged errors in the jury instructions. The application was dismissed in 2000, and he appealed. The appeal was dismissed for want of prosecution later that year. In 2005, Aguilera filed a second application for postconviction relief, which was amended in 2007. The second application is the subject of this appeal. It was based on an alleged *Brady* violation[2] and various other issues that were not appealed. The application alleged that the State failed to turn over a DCI file containing interviews with various people.[3] The file was turned over on October 2, 2006. Two of the

---

[2]A *Brady* violation is a due process violation that occurs when the state fails to turn over exculpatory evidence. *See Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196, 10 L. Ed. 2d 215, 218 (1963).

[3]Aguilera also argued that the assistant county attorney who prosecuted him was subsequently convicted of several crimes and that these convictions amount to newly discovered evidence warranting a new trial. The assistant county attorney in this case, Jeffrey TeKippe, was found guilty of misconduct in office and his conviction was affirmed by the court of appeals in 2009. *State v. Tekippe*, No. 07–1840, 2009 WL 1492660 (Iowa Ct. App. May 29, 2009). Aguilera's brief claims TeKippe's conviction is new evidence; but in order to be newly discovered evidence, the new evidence must have "been known to the prosecution but unknown to the defense" at the time of trial. *Harrington v. State*, 659 N.W.2d 509, 522 (Iowa 2003) (internal quotation marks

individuals whose interviews were included in the file testified at trial (Guido and Lopez) and four did not (Ramae Shuver, Zeidy Aguilera, Roberto Reyes, and Graciela Lucio). The contents of these statements and any potential impact they may have had on the trial's outcome will be discussed in greater detail throughout the opinion.

In January of 2010, the district court dismissed Aguilera's postconviction relief application. The district court concluded that the entire DCI file containing the statements had been suppressed and that it contained exculpatory information. However, the district court also concluded that the statements were not material and Aguilera was not prejudiced by not having them available prior to trial. Aguilera appealed this decision. The court of appeals found that portions of Guido's statements contained in the DCI file were not suppressed because they had been revealed to Aguilera by virtue of a detailed pretrial disclosure. The court of appeals affirmed the district court's conclusion that Guido's statement was exculpatory, but not suppressed or material. The court of appeals concluded that Lopez's statements were suppressed and exculpatory, but his statements were also not material to the issue of guilt. The court of appeals found the remaining statements were suppressed and could have had impeachment value, but were not material to the issue of guilt. Accordingly, it affirmed the dismissal. We granted further review.

**II. Standard of Review.**

"When the applicant's claims are of a constitutional nature, we will conduct a de novo review." *Desimone v. State*, 803 N.W.2d 97, 102 (Iowa

_____

omitted). Since TeKippe's conviction occurred after Aguilera's trial, it cannot be considered newly discovered evidence.

2011). Accordingly, we review *Brady*-due-process-violation claims de novo. *Id.*

### III. Discussion.

The prosecution's affirmative duty to disclose evidence favorable to a defendant can trace its origins to early twentieth century strictures against misrepresentation and is, of course, most prominently associated with the Supreme Court's decision in *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). *Brady* held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S. Ct. at 1196–97, 10 L. Ed. 2d at 218; *see also Cornell v. State*, 430 N.W.2d 384, 385 (Iowa 1988). "To establish a *Brady* violation has occurred, [the defendant] must prove by a preponderance of the evidence '(1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material to the issue of guilt.' " *Desimone*, 803 N.W.2d at 103 (quoting *Harrington v. State*, 659 N.W.2d 509, 516 (Iowa 2003)); *see also Cornell*, 430 N.W.2d at 385. Aguilera claims the State's failure to disclose statements the DCI took from six individuals constitutes *Brady* violations. The statements that form the basis of this appeal came from Lorenzo Lopez, Salvador Guido, Roberto Reyes, Graciela Lucio, Ramae Shuver, and Zeidy Aguilera. Lopez, Guido, Reyes, and Lucio were all at the party where the shooting occurred. Zeidy was at the residence she shared with Garcia at the time of the shooting. Shuver was not present, but worked with Garcia and Aguilera at Sparboe Farms. Shuver told the DCI she suspected Aguilera was extorting money from undocumented workers.

**A. Suppression of Evidence.** Nondisclosure of evidence is the touchstone of suppression. *Desimone*, 803 N.W.2d at 103. To establish that the evidence was suppressed, Aguilera does not need to show any "bad faith" on the part of the State. *Id.* The State has a duty to disclose exculpatory evidence regardless of whether the accused requests it. *Id.*; *see also Harrington*, 659 N.W.2d at 522. The test for suppression does not require that an individual prosecutor knows of the information; rather, a prosecutor has a responsibility "to learn of any favorable evidence known to . . . others acting on the government's behalf in the case, including the police." *Harrington*, 659 N.W.2d at 522 (internal quotation marks omitted). Regarding the suppression of evidence, we have stated, "Exculpatory evidence is not 'suppressed' if the defendant either knew or should have known of the essential facts permitting him to take advantage of the evidence." *Cornell*, 430 N.W.2d at 385. Before we will say that defense counsel lacked diligence or should have known of the exculpatory evidence, "defense counsel must be aware of the potentially exculpatory nature of the evidence and its existence." *Desimone*, 803 N.W.2d at 103. We have noted that access to police reports, as opposed to mere knowledge of the reports, provides essential facts and a "range and detail of information necessary to fully understand the implications of the police investigation" that oral disclosure of the reports cannot provide. *Harrington*, 659 N.W.2d at 522–23 (internal quotation marks omitted).

The district court determined the entire DCI file was suppressed. The court noted that Aguilera's attorney impeached Lopez and Guido at trial with inconsistent statements made during their depositions. It was inconceivable that he would not use the prior inconsistent DCI statements as well, if he had access to them. The court also noted that

Aguilera's first attorney testified he never received the DCI file, an inspection of the public defender's file did not reveal any such DCI file, and the State could not offer any document showing the DCI file had been delivered to Aguilera.

On appeal, the only dispute regarding the suppression issue arises out of Guido's statements. Guido's allegedly suppressed statements were taken by DCI agent William Basler on August 19 and 21, 1996, days after the shooting. In these statements, Guido said he was at his house most of the day, cooking meat in preparation for the party he and his roommates were hosting. On August 19, Guido stated he was inside when he heard the gunshot; that he only went outside after the gunshot; that he did not see anyone with a gun that evening; and that when he went outside after he heard the shot, he saw Garcia laying on the ground.

On August 21, Guido gave another statement to Basler. This statement differed from the statement made two days earlier. In the August 21 statement, as well as during his deposition and at trial, Guido claimed to have been outside when he heard the sound of a bottle or can hitting something and that noise caused him to look in the direction of Aguilera and Garcia. He then claimed he saw Aguilera and Garcia arguing. When Garcia got out of the Blazer, Guido claimed Aguilera drew a gun from his back and shot Garcia when the two were approximately six feet apart. According to Guido, a struggle for the gun then ensued and Garcia fell to the ground.

Aguilera deposed Basler on October 23. At his deposition, Basler stated that Guido said he was inside the house at the time of the shooting and that he went outside when he heard the shot. According to Basler's deposition, Guido also said he never saw a gun. Basler did not

disclose Guido's statement that all his roommates, which would include Lorenzo Lopez, were inside the house watching a movie at the time of the shooting.

The court of appeals found that the portion of Guido's August 19 statement in which he said that he was inside the house at the time of the shooting, that he never saw the shooting, and that he never saw a gun were not suppressed because detailed disclosure of the statement was made during Basler's deposition. We disagree. Basler's deposition testimony disclosed the fact that, at one point, Guido denied seeing the shooting and placed himself inside the house, as opposed to being outside the house and witnessing the shooting, as Guido testified to at trial. However, his testimony did not include the date that the statement was made, the fact that Guido made a contradictory statement two days later, or the fact that Guido placed Lopez, the only other eyewitness in this case, inside the house.

Basler's deposition did not provide "the essential facts permitting [the defendant] to take advantage of the evidence." *Cornell*, 430 N.W.2d 385. Aguilera did not receive the DCI file containing Guido's statement, even though the district court ordered the prosecution to turn over the entire file. Aguilera only received a fraction of the information contained in the DCI file, and the portion of the statement that Aguilera did receive was filtered through the DCI agent's memory and perception. We have noted the importance of receiving the actual police report itself, as opposed to mere oral disclosure of information contained in the reports, stating, "Only access to the documents themselves would have provided the range and detail of information necessary to fully understand the implications of the police investigation." *Harrington*, 659 N.W.2d at 523 (internal quotation marks omitted). The prosecution failed to turn over

the entire DCI file. Therefore, all of the witness statements contained in that file were suppressed.

**B. Favorability.** We now move to the second step of the *Brady* analysis: Whether the evidence was favorable to the accused. *Desimone,* 803 N.W.2d at 105. The district court found, and the State does not dispute, that all of the statements listed above were exculpatory. We agree. " 'Impeachment evidence . . . as well as exculpatory evidence, falls within the *Brady* rule.' " *Id.* (quoting *United States v. Bagley,* 473 U.S. 667, 676, 105 S. Ct. 3375, 3380, 87 L. Ed. 2d 481, 490 (1985)). Since all of the statements contained in the file could be used to either impeach a witness or support alternate interpretations of events, these statements were all clearly exculpatory.

**C. Materiality.** For a violation of due process, the suppressed, favorable evidence must be "material" to the issue of guilt. *Id.* To determine materiality, we consider the totality of the circumstances to determine whether there is a reasonable probability that, if the evidence had been disclosed, the result of the proceeding would have been different. *Harrington,* 659 N.W.2d at 523–24. We have repeatedly stated:

> "[T]he materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions. Rather, the question is whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' "

*Id.* at 523 (quoting *Strickler v. Greene,* 527 U.S. 263, 290, 119 S. Ct. 1936, 1952, 144 L. Ed. 2d 286, 307 (1999) (citation omitted)); *see also Desimone,* 803 N.W.2d at 105. However, the defendant does not need to prove disclosure of the evidence certainly would have resulted in his acquittal, only that there is a "reasonable probability" that it would have

changed the outcome of the trial. *Harrington*, 659 N.W.2d at 523 (internal quotation marks omitted). However, a "reasonable possibility" of a different outcome would be insufficient to require reversal. *Desimone*, 803 N.W.2d at 105.

Withholding impeachment evidence can form the basis of a *Brady* violation, but when a witness's testimony has been otherwise impeached with prior inconsistent statements, we are less likely to find the impeaching statements would have impacted the outcome of the trial. *Cornell*, 430 N.W.2d 386. Also, the inconsistencies used to impeach a witness must involve "substantive evidence" of the defendant's guilt or innocence. *State v. Veal*, 564 N.W.2d 797, 810 (Iowa 1997), *overruled in part on other grounds by State v. Hallum*, 585 N.W.2d 249, 253 (Iowa 1998), *cert. granted, judgment vacated on other grounds*, 521 U.S. 1001, 119 S. Ct. 2335, 144 L. Ed. 2d 233 (1999). However, when considering whether there is a reasonable probability the outcome would be different, we are not limited to merely evaluating the weight of evidence. We can also "assess the possible effects nondisclosure had on trial preparation and strategy." *Desimone*, 803 N.W.2d at 105; *see also Harrington*, 659 N.W.2d at 524 (citing the importance of defense counsel's ability to "zero in" on certain witnesses when forming alternative theories of the crime). When suppressed evidence leads to a new trial "dynamic," we have found the evidence to be material. *Desimone*, 803 N.W.2d at 106.

An additional aspect of materiality that needs to be stressed under the facts of this case is that suppressed evidence is to be considered collectively, not item by item. *Kyles v. Whitley*, 514 U.S. 419, 436–37, 115 S. Ct. 1555, 1567, 131 L. Ed. 2d 490, 507 (1995). "While the definition of . . . materiality in terms of the cumulative effect of suppression must accordingly be seen as leaving the government with a

degree of discretion, it must also be understood as imposing a corresponding burden." *Id.* at 437, 115 S. Ct. at 1567, 131 L. Ed. 2d at 508.

Lopez and Guido were the only eyewitnesses who testified about what happened between Garcia and Aguilera when the shot was fired. Their stories differed in one key respect: Guido said Garcia and Aguilera were a few feet apart when the gun went off and Lopez said they were struggling when the gun went off. In other words, if the jury believed Guido, then an accidental shooting would have been less likely because the shot was fired before the two began to struggle. If the jury believed Lopez, then the shot may have been fired after a struggle, which makes an accidental shooting far more likely. In its ruling on the application for postconviction relief, the district court stated, "[T]here is no claim of accident" by Aguilera. In Aguilera's original appeal of his conviction in 1998, the court of appeals found otherwise, explicitly stating, "We find Aguilera's defense was based on accidental shooting and not self-defense." We agree with the court of appeals. In his opening statement at trial, Aguilera's attorney claimed the shooting was accidental. When he cross-examined Guido and Lopez, he asked how far apart Garcia and Aguilera were when the gun went off and whether the two were wrestling before or after the shot was fired. The credibility of both Lopez and Guido was a key issue at trial, which increases the likelihood that any impeachment evidence contained in the DCI file might have changed the outcome of the trial, or our confidence in the trial, and would therefore be material.

The suppressed statements of Guido, Lopez, and Reyes would all serve to undermine the trial testimony of Lopez and Guido. In his August 19 statement, Guido said that he was inside the house when the

shooting occurred; that he did not see a gun; and that his roommates, which would include Lopez, were inside watching a movie when the shooting occurred. In his August 21 statement, Guido placed himself outside, in front of the garage by the grill, when he heard the shot. He then looked toward the shot and saw Garcia lying on the ground. At his deposition, Guido stated he heard the noise of metal hitting metal, so he looked towards Garcia, who was sitting in his car. At that point, he saw Garcia and Aguilera arguing. Garcia then exited his car. Guido claimed Aguilera pulled a gun out of his waistband and shot Garcia. After the shot was fired, Garcia grabbed Aguilera's arms and the two briefly fought over the gun until Garcia collapsed. Guido's trial testimony substantially mirrored his deposition.

Aguilera's attorney would have been able to cross-examine Guido far more effectively if he had Guido's August 19 and 21 statements to the DCI. Not only are the two statements inconsistent with his deposition and trial testimony, they are inconsistent with each other. Through the course of these statements, Guido's claims progress from him having been inside and not having seen or heard anything prior to the gunshot, to him being outside and hearing a bottle or can hit something before the shot, and finally to actually seeing Aguilera fire the shot that killed Garcia. The statements Guido made to the DCI would be inadmissible hearsay if they were offered to prove what Guido said on August 19 and 21 was actually true. Iowa R. Evid. 5.801(c), 5.802. However, the statements would have been admissible to impeach Guido. Iowa R. Evid. 5.613. If the prosecution had provided Aguilera with these documents, he would have been allowed to present them to Guido at trial and to ask Guido to explain the drastic inconsistencies between his initial statements given to the police in the few days immediately following the

shooting and his deposition and trial testimony, which occurred several months later. This dramatic display would have been far more effective than pointing out minor inconsistencies between Guido's deposition and his trial testimony, which was the only impeaching evidence available to Aguilera at trial. When a case turns on the credibility of a witness, this type of suppressed impeachment evidence is certainly material.

Guido's testimony contains other inconsistencies that would make the jury less likely to believe him. He testified that Garcia and Aguilera were two meters apart when the gun went off. However, the State's weapons expert testified that the gun was no more than six inches from Garcia's chest when it went off. Lopez testified that Garcia and Aguilera were fighting over the gun when it went off, not afterwards. The testimony from the State's expert is consistent with Lopez's account, but inconsistent with Guido's.

The suppressed DCI file also contained a statement from Graciela Lucio. Lucio did not testify, she was never deposed, and her identity was never revealed to Aguilera. Lucio stated she heard someone shout "they're fighting" before she heard a gunshot and saw a flash of light from the gun. While someone shouting that people are fighting does not necessarily mean that the two people are currently engaged in a close struggle, it does lend support to Lopez's description of the events. Moreover, if Lucio heard the shout that people were fighting, and subsequently heard the shot, one imagines that others at the scene would have as well. Without her statement, or even knowledge of its existence, Aguilera had no way of knowing that someone had shouted about a fight prior to the gun going off, and he was denied the ability to ask Lucio questions about the event. The limitations of Aguilera's access

to this witness and her statement weigh in favor of finding the suppression of the DCI file to be material.

Ramae Shuver also gave a statement to the DCI that was not turned over.[4]  She told DCI that she believed Aguilera was extorting money from other Hispanics at work.  She claimed she found a list on Aguilera's desk and that she asked another co-worker if everyone on that list had to pay Aguilera $200 per month.  If it turned out that the defendant was extorting his co-workers, many of whom attended the party where the shooting occurred, this may certainly have changed Aguilera's trial strategy, as well as the dynamic of the trial.  *Desimone*, 803 N.W.2d at 105–06; *Harrington*, 659 N.W.2d at 523.  In his deposition prior to the hearing on the application for postconviction relief, Aguilera's trial counsel stated that he did not recall hearing of any extortion plans involving Aguilera.  Regarding extortion schemes and migrant workers, Aguilera's trial counsel stated that he had an "understating of how generally it works[.] . . . [I]f I'm working and you want to work at the same place that I work, if I get you a job there, you owe me money.  And basically, you have to pay me a portion of your earnings for as long as you work there."  Aguilera's attorney knew enough about this practice that, if he had been given Shuver's statement, Aguilera's attorney would have been able to fully investigate the allegations.

While no one can be certain what that investigation would have uncovered, Shuver's statement may have changed Aguilera's strategy at

---

[4]The district court found Shuver's statement was suppressed.  The State has not appealed this finding, nor has it argued Shuver's statement was not suppressed under *Brady*.  Since "[e]xculpatory evidence is not 'suppressed' if the defendant either knew or should have known of the essential facts permitting him to take advantage of the evidence," the State could have argued Shuver's statement was not suppressed. *Cornell*, 430 N.W.2d at 385.  The State has not made this argument, and therefore, for purposes of this case, we will consider Shuver's statement suppressed and only consider the statement's cumulative impact on materiality.

trial. It may have uncovered a widespread bias against Aguilera on the part of the employees at Sparboe, several of whom attended the party and testified against him. Again, the test is not whether the evidence, in and of itself, is material, but whether the evidence would change the defendant's trial strategy and lead to a new dynamic at trial. *Desimone*, 803 N.W.2d at 105–06; *Harrington*, 659 N.W.2d at 523. The test for materiality is whether that new strategy gives us confidence that there is a reasonable probability the outcome of the trial might have been different if the favorable material had been made available to the defense in a timely manner. *Desimone*, 803 N.W.2d at 105. While Shuver's statement, in isolation, may not have been material, when viewed in connection with the other statements the State failed to turn over, it supports a finding of materiality.

Lopez also gave inconsistent statements to the DCI investigator that were suppressed. In Lopez's August 19 statement, he placed himself inside the house at the time of the shooting and claimed that he did not see or hear anything. This is consistent with Guido's August 19 statement. On August 22, Lopez gave another statement, this time claiming that he was talking to Garcia at Garcia's car when Aguilera approached and Garcia and Aguilera began to argue. Once the arguing started, Lopez began to back away. Aguilera then took two steps back and pulled out a gun. Garcia then exited the car and grabbed Aguilera's arm, which caused the gun to turn towards Lopez. At that point, Lopez turned away. As he was turning away, he heard the shot. When he turned back, he saw Aguilera running away. Lopez's deposition and his trial testimony are substantially similar to his August 22 statement.

In Guido's August 21 statement to the DCI, he continues to maintain that Lopez was in the house before the shot was fired. After

further questioning, Guido stated that he thought he saw Lopez in the house *after* the shot, but that he was not sure because he was frightened by the shooting. At that time, Guido also stated that Lopez told him that he was standing by Garcia's car, that he left when Aguilera approached, and that he heard the shot after he returned to the house.

Roberto Reyes was interviewed on August 21. He stated that he was watching television with Lopez at the party and that he saw Lopez in the kitchen with Guido immediately after the shooting. He also stated that he and another person were the only two people in the house and that Lopez was not in the house. Reyes did not testify at trial, and Basler did not mention interviewing Reyes at his October 23 deposition. There is no evidence Aguilera knew Reyes existed or that he might have information regarding the incident. While the State points to aspects of Reyes's statement that are inconsistent and confusing as to where exactly he believed Lopez was at the time of the shooting, that confusion is not dispositive of whether the suppression of his statement was material. If Aguilera had been provided with Reyes's statement, or even been made aware of his existence, he could have deposed him and clarified exactly where Reyes believed Lopez was at the time of the shooting.

The suppressed DCI file contains many statements that make an accidental shooting far more likely. Lopez claimed that he was outside talking to Garcia when Aguilera approached. The two argued, and Aguilera pulled out a gun. During a struggle over the gun, that was described in great detail in Lopez's statement to the DCI, the gun went off. His second statement is similar to his deposition and his trial testimony. Lucio's statement also supports the theory that the fight began before the gun went off. While the DCI file bolsters Lopez's story,

it substantially weakens Guido's. It contains two statements that are inconsistent with each other and that differ greatly from his deposition and trial testimony. Shuver's statement also creates the possibility that Guido may have had a motive to implicate Aguilera.

Suppressed evidence is material if it creates a "reasonable probability that if the evidence had been disclosed, the result of the proceeding would have been different." *Desimone*, 803 N.W.2d at 105. It is impossible to know with certainty what role the statements of Shuver, Lucio, and Reyes would have played in Aguilera's defense. Unfortunately, due to the State's refusal to turn the DCI file over, even after a court order was issued requiring the State to release the file, Aguilera was never able to investigate any of these statements, and therefore much of their value is speculative. However, these statements, along with those of Guido and Lopez, would have provided ample impeachment evidence that Aguilera could have used to bolster his claim of an accidental shooting. In this case, the State's failure to turn over clearly exculpatory material handicapped not only the defendant, but also the trier of fact. If this evidence had been placed in front of the jury, there is a reasonable probability that at least one juror would have concluded the gun went off by accident, as opposed to an intentional shooting. This type of obstruction of the fact-finding process cannot be immaterial and, when viewed cumulatively, severely undermines confidence in the conclusion reached by the jury. After reviewing these statements, we cannot be confident in the result of this trial. *See Harrington*, 659 N.W.2d at 525. We conclude there is a reasonable probability that had these statements been turned over to the defense, the outcome of the trial would have been different. The DCI file and statements were material.

## IV. Disposition.

Because we determine that the suppressed, favorable statements which were not turned over by the State had a reasonable probability of impacting the outcome of the trial, we find a *Brady* violation occurred in this case and Aguilera's due process rights were violated. We vacate the court of appeals decision, reverse the district court's ruling denying Aguilera's application for postconviction relief, and remand the case to the district court.

**DECISION OF THE COURT OF APPEALS VACATED; JUDGMENT OF THE DISTRICT COURT REVERSED, AND CASE REMANDED.**

All justices concur except Mansfield, J., who takes no part.