# IN THE COURT OF APPEALS OF IOWA

No. 22-1293
Filed January 10, 2024

**STATE OF IOWA,**
 Plaintiff-Appellee,

vs.

**JAMES WILLIAM THIEL SR.,**
 Defendant-Appellant.
_____

 Appeal from the Iowa District Court for Scott County, Patrick A. McElyea, Judge.

 A criminal defendant appeals his two convictions for involuntary manslaughter. **AFFIRMED.**

 Leon F. Spies of Spies & Pavelich, Iowa City, for appellant.

 Brenna Bird, Attorney General, and Timothy M. Hau, Assistant Attorney General, for appellee.

 Heard by Tabor, P.J., Buller, J., and Doyle, S.J.*

 *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2024).

**BULLER, Judge.**

A jury found James Thiel guilty of two counts of involuntary manslaughter. The convictions stem from a two-boat crash on the Iowa side of the Mississippi River. On appeal, Thiel claims the State violated his right to due process by suppressing two draft diagrams drawn by an expert witness before trial. He also argues there was insufficient evidence to support his convictions. And he asserts the verdict was inconsistent and against the weight of the evidence. On our review, we affirm Thiel's convictions.

## I.    Background Facts and Proceedings

One August 2020 afternoon, Craig Verbeke, Anita Pinc, and their black Labrador Retriever Lily met people for lunch after Sunday church, as was weekly tradition. On this particular day, the couple dined with family, including two of Verbeke's daughters. The group chose that location because it was close to the Mississippi River, and they planned to boat that afternoon on Pinc's nineteen-foot Bayliner speed boat. After lunch, Verbeke and Pinc went out on the Bayliner, accompanied by Lily. A spectator tubing on the river later described the Bayliner nearly hitting a rock pile and idling in the path of boat traffic.

Thiel, his wife, their three sons, and an employee's family had a similar afternoon. The group got on the Thiel family's boat—a thirty-five-foot Triton—just after noon and had lunch upriver. Throughout the day, Thiel's fifteen-year-old son was operating the boat. Thiel described his son as "a different breed when it comes to boating" who "always wanted to jump up in the seat with me and drive." Thiel's son got his boater's license at twelve, and Thiel thought him to be "an extremely responsible and capable boater," with experience operating the Triton.

Thiel's group was joined by some friends in a Scarab jet boat shortly after lunch. Both groups boated on the river and met up again later in the afternoon near some sand pits. After that, the Scarab group invited the Triton group to their cabin for brisket. The Scarab group left "a little bit before" the Triton group, with Thiel's son piloting the Triton.

The groups initially took diverging paths: the Triton went down the main channel of the river, and the Scarab took shallower backwaters. But the two boats converged before long, as they made their way into LeClaire.

According to the Scarab's pilot, they were going 45 miles per hour (mph) as they approached the Riverboat Twilight (Twilight), a large ferry boat near a boat ramp. Thiel's son recalled he was piloting the Triton around 40 mph. Thiel reported he was standing in the back of the boat, behind the console, and wasn't giving his son any instructions: his son was "always in control of the boat." According to Thiel's son, the Scarab "was always a ways ahead of" them. Another passenger on the Scarab echoed this, claiming the Triton was following in the Scarab's wake, which is "the safest place to be when you're driving back." Thiel and that passenger both testified the two boats were never side-by-side or racing.

But disinterested witnesses on and around the river that day told a different story. These witnesses saw the Triton and the Scarab racing as they came into town—close to shore—with "[p]robably a boat's distance between each other" and the Scarab in the lead. The witnesses used varied and colorful language to describe the racing, but they were unanimous in describing the danger they perceived on the water:

**A witness along the waterfront:** "I told [the police the Triton and Scarab] were hauling ass . . . ."

**A woman sitting on a bench next to the river:** "Because the speed of how fast they were going . . . [it] felt like neck and neck, you know what I mean?  Like, the one flew by, then the bigger one was right behind it.  It just—and it was very excessive, the speed.  And like I said I don't know what the mile per hour is but it was very fast."

**A motorcyclist along the river:** "[A]s we were approaching the Twilight there was two boats that came flying by at a high rate of speed next to the river.  It actually startled me on the bike.  And then at some point in time we heard a noise and the wife tapped me on the shoulder and said, 'You better turn around.'  So we turned around."

**The motorcycle passenger:** "[T]hey were side by side going the same speed and almost like neck and neck.  So it appeared to me that they were racing."

**A passenger on another boat on the river:** "I mean, for lack of a better way to say it, it seemed like they were almost scissoring at each other, just kind of going at each other, you know, racing and maybe taunting each other."

**Another passenger on that same boat:** "[T]hey were going at a good rate of speed.  They were moving very fast and what I remember the most is seeing all the multicolored life jackets up in the front of the [Triton].  Appeared to be a bunch of children up in the front.  We kind of had a conversation, you know, 'why would you be driving like that with all those kids in the boat?'"

**A teacher eating at a restaurant along the river:** "I heard two boats open up which means they were just flooring it.  They were going at a high rate of speed and it drew my attention.  So I looked over my shoulder and I saw two boats side by side close to each other and close to the shore.  And I remember making a comment to my wife, 'Look at those idiots racing past the boat landing that close.'"

**A woman eating dinner with her husband near the boat-ramp parking lot:** "I said, 'My God, he's flying.'  And then as they went past us both of us said, 'Oh, my God, he's going to hit him.'"

**A passenger on another boat:** "I'm sure that we made a lot of comments that I don't know if you want me to elaborate on here [in the courtroom], but one of them was definitely, 'They're going to kill

someone.' I just don't think any of us expected that to happen a few minutes later."

While the Scarab and the Triton approached the Twilight, an aluminum fishing boat was moving downriver. One of the fishing boat's passengers saw the Scarab go by "a little fast for a heavy populated boat area." After the Scarab, the men in the fishing boat saw Verbeke pilot the Bayliner "across the [Scarab's] waves" upriver "straight" into their path. But then the Bayliner "veered off . . . very close" to the fishing boat, toward the other side of the river. Some witnesses described the Bayliner as "just kind of tootling along, not moving very fast"; others described the vessel as "sitting sideways in the middle of the river." After this change in direction, the Triton and the Bayliner collided.

Thiel and his son claimed to see the Bayliner hitting waves a "little bit like near" the Twilight before the collision. Thiel's son testified the Bayliner then "cut across our path like they were cutting us off," so he began to slow down and call for Thiel to come up from the back. "I was like, 'Dad, I don't know what these guys are doing. They're driving crazy.' And I was just yelling for him to come up and that's what he did." But Thiel testified he didn't make it in time. According to Thiel's son, the Bayliner "show[ed its] nose like it was going to the right of us" so he "instinctively turned left to try and avoid them." But despite trying to "avoid the Bayliner at all costs," Thiel's son claimed the boat "turned back into us" leading to a collision.

Other witnesses gave differing accounts of the collision. Some testified the Bayliner hit the Triton: "It's my opinion that the little boat went right in the direction

of where the [Triton] was going . . . ." And some witnesses testified the other way: "The big [boat] slammed into the little one."

The collision launched Thiel from the Triton into the river. He surfaced near the Bayliner and swam on board. Thiel discovered Verbeke near the Bayliner's console "slumped over the side of the boat" and could not tell if he was breathing. Thiel attempted cardiopulmonary resuscitation (CPR) on Verbeke.

Meanwhile, on the Triton, Thiel's son "was shook." He testified that, "once [the Bayliner] hit us it was like a blank in my mind, and then when I came back to it [Thiel] was just gone and I didn't know where he went. I was freaking out." One of the Triton's passengers called 911 and gave Thiel's son the phone. He told the operator: "We were going really fast and this boat pulled out in front of us. And we hit them."

Multiple law enforcement agencies, including the Iowa Department of Natural Resources (DNR), responded. Once the Bayliner was towed to shore, Thiel disembarked so firefighters could board. The firefighters declared Pinc dead at the scene. A medical examiner later determined her cause of death was blunt force injuries to the head, neck, and trunk. Verbeke still had a pulse, and first responders took him to the hospital. He died three days later from injuries sustained in the collision.

Thiel spoke with police shortly after the crash and gave his version of events:

> We're coming down the river. And all of a sudden, out of nowhere, this boat turns left into us. And I'm sitting at this helm with my son . . . and he's like "dad, dad, dad!" and I said "well shut it down, shut it down." And he comes and he hits us. And I'm on the right side of the boat and knocks me out of the boat. And I get up . . . I look

around and all of a sudden I see this boat. And I climb up in this boat and I didn't know there was anybody in it or not anybody in it. I jumped in and I found the driver. So I started giving him CPR. And I gave him CPR all the way . . . my friends pulled him back in. And I'm giving him CPR all the way back in man . . . I'm telling you we were going straight down the river and he came, we could not avoid him.

That night, Thiel and others on the Triton maintained the Bayliner crashed into them. And Thiel continued to say he was right next to his son at the helm during the collision. Thiel's son told a DNR officer the Triton was "a little bit behind" the Scarab at the time of collision. And the Scarab's pilot told the DNR's lead investigator, Officer Travis Graves, they were "to the side" of the Triton before the collision. Both the Bayliner and Triton had coolers filled with alcohol on board. Verbeke's blood alcohol content was .102—over the .08 legal limit. Thiel recalled he'd had at least seven drinks that day, starting around noon.

Following a DNR investigation, the Scott County Attorney charged Thiel with four counts of involuntary manslaughter. Two counts alleged involuntary manslaughter by commission of a public offense, class "D" felonies in violation of Iowa Code section 707.5(1)(a) (2020). The other two counts alleged involuntary manslaughter by acting in a manner likely to cause death or serious injury, aggravated misdemeanors in violation of section 707.5(1)(b).

Based on results from the investigation, a DNR officer opined the damage to the Bayliner was inconsistent with it hitting the left side of the Triton. And a Wisconsin DNR officer helping with the investigation concluded the damage instead showed the Triton struck the Bayliner. Relying on global positioning system (GPS) data from the Triton, the Wisconsin DNR officer surmised: "there was no evasive action [by the Triton], no change in speed. If there was a course

direction of change it was very minimal . . . I feel there was no evasive action to avoid that collision." The Wisconsin officer could not say, however, whether the Bayliner turned into the Triton's path.

Employees of the company that manufactured the Triton's center engine extracted and analyzed data from the engine's electronic control unit. Based on this data, the employees concluded the Triton was at "full throttle" for most of the 100 seconds right before the collision, traveling approximately 56.9 mph. They also found the Triton's engine likely reduced speed in the final seven or eight seconds of operation.

Iowa DNR Officer Graves, who testified as an expert for the State at trial, concluded the Triton went over the top of the Bayliner at the time of collision. And he found this "override or ramping" motion indicated the Triton was operating at a high speed. Based on the Triton's GPS data, Officer Graves calculated the boat was 100 yards from the Twilight and going 54.99 mph one minute before collision. Officer Graves estimated the Bayliner was going 25 to 35 mph. And he opined the Triton's speed was not safe given "[t]he size of the boat, the location, where the incident happened at, [and] the amount of other boats in the water that day."

A focus of Officer Graves's cross-examination was a diagram from his report, referred to as Exhibit S4. According to Officer Graves, S4 "was used as a working document just to kind of paint a picture of where everyone was at just to provide a better understanding of the incident." He generally agreed S4 was important to the investigation but "wouldn't say it was the most important document in [his] investigation." The diagram was based on a "compilation of GPS data,

physical boat damage and eyewitness statements." Based on that compilation, the diagram depicted the Bayliner turning right before the collision.

A retired United States Coast Guard officer testified as Thiel's expert. He concluded Thiel's son "was doing what was required" under the circumstances when he turned the Triton left. Based on his review of Officer Graves's report and the underlying witness statements and data, Thiel's expert determined "the vessels were not that close except, of course, when they collided. But had they maintained the course and speed before the collision they would have passed roughly 100 feet apart." He opined the Bayliner likely "reversed course" and turned into the Triton's path. And he submitted Verbeke's intoxication was the cause of collision. Thiel's expert explained his analysis was based on his opinion that S4 was Officer Graves's "best determination of where the" boats were.

In rebuttal, Officer Graves testified that S4 was of "very little" importance in his overall investigation. And he reiterated that the diagram was not to scale. According to his testimony on rebuttal, the only thing certain on S4 was the position of the Triton because of its GPS data. The position of all other boats, paths, and distances was based on the recorded damage and witness testimony.

For the first time on rebuttal cross-examination, Officer Graves testified there were "working documents" or earlier drafts of S4 that he had provided to the county attorney's office. Before the case went to the jury, Thiel moved for production of any draft diagrams Officer Graves "prepared and furnished to the county attorney." Thiel's attorney made a record that he had not received any draft documents in discovery and indicated he might move "to reopen the record if there's anything of substance about these additional documents." The district

court denied the motion based on the county attorney's statement he provided everything received from Graves to the defense. The county attorney's statement ultimately proved inaccurate: he provided the defense with Graves's entire investigative report but not the draft diagrams, which had apparently been e-mailed separately.

The jury found Thiel not guilty on both counts of involuntary manslaughter by public offense but convicted on both counts of involuntary manslaughter by conduct likely to cause death. Thiel polled the jury but made no other requests when the verdict was returned.

Thiel later moved for a new trial. In his motion, he alleged a violation of his due process rights by the county attorney's failure to disclose the draft diagrams before trial, asserted the verdicts were inconsistent, and asked the court to find the evidence heavily preponderated against the verdict and warranted a new trial. The district court orally denied Thiel's motion for new trial at sentencing and ordered him to serve concurrent sentences of one year in jail with all but ninety days suspended for each count.

Thiel appeals.

**II.      Discussion**

Thiel advances four arguments on appeal. First, he reiterates his claim the State violated his due process rights by not turning over the two draft diagrams. Second, he asserts his convictions are not supported by substantial evidence. Finally, he makes two challenges to the ruling on the motion for new trial, asserting the verdict was inconsistent and it was against the weight of the evidence. The

State responds to each argument on the merits but also raises error-preservation and wavier concerns. We address each of Thiel's claims in turn.

### A. Due Process and the Draft Diagrams

A prosecutor's potential failure to produce exculpatory evidence can violate due process. *Brady v. Maryland*, 373 U.S. 83, 86–87 (1963). We review alleged *Brady* violations de novo. *State v. Leedom*, 938 N.W.2d 177, 185 (Iowa 2020).

To show a *Brady* violation related to the draft diagrams, Thiel had to prove three elements by a preponderance of the evidence:

1. The prosecution suppressed evidence;
2. This evidence was favorable to the accused; and
3. The evidence was material to the issue of guilt.

*Cornell v. State*, 430 N.W.2d 384, 385 (Iowa 1988) (citation omitted). The district court found Thiel proved none of the three. For purposes of this appeal, we focus on materiality. *See State v. Romeo*, 542 N.W.2d 543, 552 (Iowa 1996) (opting to only address one prong of the analysis). On this element, the district court found the draft diagrams were not material to guilt because they had little impact on trial preparation, strategy, or the ultimate weight of the evidence.

Suppressed "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985); *accord Harrington v. State*, 659 N.W.2d 509, 523 (Iowa 2003). This "reasonable probability" does not require proof the defendant would "more likely than not" have been acquitted. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). But the evidence must do more than show the "reasonable possibility" of a different outcome. *DeSimone v. State*, 803 N.W.2d 97, 105 (Iowa 2011) (citation omitted). In short,

we ask whether the suppressed evidence so "undermine[s] our confidence in the jury verdict" as to warrant a new trial. *Romeo*, 542 N.W.2d at 552.

In conducting the materiality analysis, we "examin[e] a counterfactual of how the trial would have played out *with* timely disclosure." *State v. Cahill*, 972 N.W.2d 19, 29 (Iowa 2022). We consider the suppressed evidence collectively, not "item by item." *Aguilera v. State*, 807 N.W.2d 249, 255 (Iowa 2011) (citing *Kyles*, 514 U.S. at 436–37). When it comes to impeachment evidence, a new trial is not warranted when "the impeachment value of [allegedly suppressed] evidence was merely incremental." *Romeo*, 542 N.W.2d at 552.

Thiel's claim on materiality is largely speculative, arguing he could have done a better job impeaching Officer Graves if he had the draft diagrams. But Thiel's own expert, who reviewed the same underlying substantive evidence that went into the diagrams, opined that Officer Graves's final diagram was "one of the best pieces of work I've seen in forty-one years relative to combining all the information, all the witness statements in coming up with a report." And Thiel does not identify any evidence he believes Officer Graves ignored, misunderstood, or failed to include in the final diagram.

Thiel's reply brief posits the draft diagrams might have enabled his expert to "address more accurately the thoroughness of the law enforcement investigation" or potential bias. But this is a general assertion made without citation to the record and without the support of additional testimony or a report from his expert. *See State v. Piper*, 663 N.W.2d 894, 905 (Iowa 2003) (finding defendant's claims that suppressed evidence "hindered the defense team's trial preparation" to be "generalized assertions" when defendant did not specify how that evidence

"would have called his guilt into question or changed his trial strategy"), *overruled on other grounds by State v. Hanes*, 790 N.W.2d 545, 551 (Iowa 2010)).

The district court below correctly pointed out the State did not offer or rely on the final diagram at trial, which suggests it had limited value to the prosecution's overall case. Although Officer Graves conceded the exhibit was important to his investigation and the diagram was his best attempt at compiling the facts, he testified the real purpose of the diagram was "to help paint a picture" for readers of his report. The trial was replete with testimony from many of the eyewitnesses relied on by Officer Graves in creating the diagram, and the witnesses consistently described how Thiel's boat was operated at a reckless speed before the fatal collision. *See Aguilera*, 807 N.W.2d at 257 (noting we consider whether the suppressed evidence "would change the defendant's trial strategy" in assessing materiality). These witnesses were subject to well-prepared cross-examination, and Thiel offers no concrete explanation for how that testimony would have unfolded differently with timely disclosure of the draft diagrams.

Overall, we find Thiel did not carry his burden to prove "the trial would have taken on a different dynamic" if he had received the two draft diagrams in discovery. *DeSimone*, 803 N.W.2d at 106. To the extent the drafts may have helped better cross-examine Officer Graves or supplied additional ammunition for Thiel's expert to undermine Graves, any impeachment value would be "merely incremental" and does not shake our confidence in the verdict so as to warrant a new trial. *See Romeo*, 524 N.W.2d at 552; *see also Watkins v. Medeiros*, 36 F.4th 373, 390–91 (1st Cir. 2022) (finding no *Brady* violation in a federal habeas case when State failed to produce a "crime scene diagram" created by police that

was "not drawn to scale" and "would have a nominal effect on impeaching" the State's key witness). Finding a failure of proof on the materiality prong of the analysis, we affirm the district court's rejection of Thiel's *Brady* claim.

## B. Sufficiency of the Evidence

Thiel next argues there was insufficient evidence to support the jury's verdict on his two manslaughter convictions. We review sufficiency claims for correction of legal error. *Cahill*, 972 N.W.2d at 27. While reviewing, "[w]e are highly deferential to the [fact-finder]'s verdict" because it "binds this court if the verdict is supported by substantial evidence." *Id.* (quoting *State v. Jones*, 967 N.W.2d 336, 339 (Iowa 2021)). In deciding whether evidence is substantial, "we view the evidence in the light most favorable to the State, including all 'legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence.'" *Jones*, 967 N.W.2d at 339 (quoting *State v. Tipton*, 987 N.W.2d 653, 692 (Iowa 2017)).

Before the merits, we address the State's claim Thiel waived this argument by failing to adequately brief it. Thiel's opening brief sets out a sufficiency challenge in the second heading, and he recites the correct standards of review at the start of his discussion section. But according to the State, Thiel failed to offer an "argument containing [his] contentions and the reasons for them with citations to the authorities relied on and references to the pertinent parts of the record" within the body of his challenge. *See* Iowa R. App. P. 6.903(2)(g)(3). In his reply brief, Thiel points us to pages where he says he challenged sufficiency. But even those pages blur the sufficiency and weight-of-the-evidence analyses. *See State v. Reeves*, 670 N.W.2d 199, 202 (Iowa 2003) (explaining the difference between

these arguments); *State v. Rivers*, No. 18-0365, 2019 WL 2150807, at *1 n.2 (Iowa Ct. App. May 15, 2019) (reiterating that a sufficiency-of-the-evidence challenge and a weight-of-the-evidence challenge are "free-standing substantive argument[s]" that require more than "boilerplate citations to legal authorities"). Assuming without deciding Thiel did not waive his sufficiency argument, we address the merits.

A person commits misdemeanor involuntary manslaughter "when the person unintentionally causes the death of another person by the commission of an act in a manner likely to cause death or serious injury." Iowa Code § 707.5(1)(b). Under our case law, recklessness is also required. *State v. Conner*, 292 N.W.2d 682, 686 (Iowa 1980). As marshaled, the State had to prove:

> 1. On or about the 16th day of August, 2020, [Thiel] recklessly allowed the vessel to be operated in an unsafe manner.
> 2. [Thiel] did the act in a manner likely to cause death or serious injury.
> 3. By doing the act, [Thiel] unintentionally caused the death of Craig Verbeke [and Anita Pinc] . . . .

The jury instructions guide our sufficiency analysis. *See State v. Canal*, 773 N.W.2d 528, 530 (Iowa 2009). As marshaled, causation is met if Thiel's actions were "a substantial factor" in Pinc and Verbeke's deaths and their deaths "would not have happened except for [his] acts." On recklessness, the instructions required proof Thiel "willfully disregard[ed] the safety of persons or property," which is "more than a lack of reasonable care which may cause unintentional injury" and instead requires proof he acted "consciously . . . with willful disregard of the consequences." The jury was also instructed "the danger must be so obvious that

the actor knows or should reasonably foresee that harm will more likely than not result from the act."

Thiel's argument on appeal boils down to his view the jury believed the wrong witnesses and came to the wrong conclusion. He highlights that some witnesses on the Triton and Scarab testified the boats were not racing and that his expert found his son's turn left turn proper under the circumstances. He also emphasizes witness testimony describing the Bayliner's dangerous boating activity earlier in the day to support his claim the Bayliner crossed into the Triton's path. (We assume without deciding this argument about the Bayliner does not run afoul of Iowa Rule of Evidence 5.404's bar on propensity evidence.) Finally, he flags Verbeke's potential intoxication as a cause of the collision.

Accepting or rejecting testimony is the role of the jury—not our appellate courts. *See State v. Nitcher*, 720 N.W.2d 547, 556 (Iowa 2006). Jurors could have chosen to believe Officer Graves's testimony that the Triton should have turned right to avoid colliding with the Bayliner. The jury was also free to believe the host of witnesses on the river who saw the Triton and Scarab as "idiots racing," "hauling ass" like "they're going to kill someone." Analysis of the Triton's GPS and engine data bolstered this eyewitness testimony by demonstrating the Triton was going dangerously fast. Finally, the jury could accept or reject observations about how the Bayliner was operating that day and still find Thiel allowing his son to race the Triton in busy waters was reckless. Given this record, substantial evidence supports the convictions and Thiel has given us no basis for disturbing the jury verdict.

**C.      The Post-Trial Inconsistent-Verdicts Challenge**

Thiel next claims the jury returned an inconsistent verdict when it acquitted him of manslaughter by public offense but convicted him of manslaughter by conduct likely to cause death.  He argues he is owed a new trial.  We address error-preservation concerns voiced by the State before moving to the merits.

**1.      Was the inconsistent-verdict challenge preserved?**

The State's error-preservation argument is twofold.  First, it asserts the district court failed to rule on Thiel's inconsistent-verdict argument when denying his weight challenge, leaving us with no ruling to review.  And second, the State argues "a post-verdict motion for new trial is not the preferred mechanism for identifying and correcting inconsistent verdicts" and Thiel failed to preserve error because he did not raise the issue before the jury was discharged.

Starting with the first argument, Thiel maintains the district court's oral denial of his weight challenge encompassed his inconsistent-verdict argument, on the theory that the court ruled "the motion for new trial is denied" and implicitly rejected all claims made in the motion, even though the court did not expressly address inconsistent verdicts.  Given our disposition of this issue on the merits, we assume without deciding error was preserved.

Moving to the second error-preservation hurdle, Thiel candidly acknowledges raising an inconsistent-verdict challenge before discharging the jury "may be the preferred method."  But he insists the challenge is properly before us based on how similar claims have been treated in the past.  *See State v. Halstead*, 791 N.W.2d 805, 807 n.1 (Iowa 2010) (noting the State conceded error preservation); *State v. Hernandez*, 538 N.W.2d 884, 888–89 (Iowa Ct. App. 1995)

(reviewing an inconsistent-verdicts claim first brought by post-trial motion while recognizing the claimed error arose when the verdict was returned). Our case law recognizes this remains a murky issue and we've avoided deciding whether raising the challenge before discharge of the jury is required. *See State v. Merrett*, 842 N.W.2d 266, 276 (Iowa 2014) (declining to rule on whether the doctrine of invited error applies); *see also State v. LuCore*, 989 N.W.2d 209, 219 & n.9 (Iowa Ct. App. 2023) ("[s]idestepping" error-preservation issues for an inconsistent-verdicts claim following a bench trial, but noting the State's position that a post-trial motion would preserve error there). We opt again to reach the merits, leaving this thorny error-preservation question for another day when it may be dispositive. *See State v. Doorenbos*, No. 19-1257, 2020 WL 3264408, at *3 (Iowa Ct. App. June 17, 2020) (opting to review an inconsistent-verdicts claim despite the State making a similar preservation argument).

### 2. Were the verdicts legally inconsistent?

"The consequence of a potentially inconsistent jury verdict is a question of law" that implicates a defendant's constitutional rights. *Merrett*, 842 N.W.2d at 272; *see also Halstead*, 791 N.W.2d at 814–16. Our review is de novo. *Merrett*, 842 N.W.2d at 272–73.

When we examine jury verdicts for inconsistency, we ask whether the verdicts are "so logically and legally inconsistent as to be irreconcilable within the context of the case." *State v. Fintel*, 689 N.W.2d 95, 101 (Iowa 2004). In doing so, we liberally construe the verdicts "to give effect to the intention of the jury and to harmonize the verdicts if it is possible to do so." *State v. Goodon*, No. 19-0174, 2020 WL 2060301, at *3 (Iowa Ct. App. Apr. 29, 2020).

In returning a guilty verdict for involuntary manslaughter by conduct likely to cause death, the jury needed to find Thiel "recklessly allowed the vessel to be operated in an unsafe manner." Thiel alleges the inconsistency lies in the jury simultaneously acquitting him of involuntary manslaughter by public offense, which means the jury found one or more of these elements was not proven beyond a reasonable doubt:

> 1. On or about the 16th day of August, 2020, the Defendant, or someone he aided and abetted, recklessly committed the crime of Prohibited Operation of a Vessel . . . .
> 2. When the Defendant committed the crime, he unintentionally caused the death of Craig Verbeke [and Anita Pinc] . . . .

The marshalling instructions defined prohibited operation of a vessel to mean "operating any vessel in a careless, reckless or negligent manner so as to endanger the life, limb or property of any person."

Based on the elements, Thiel argues the verdicts are legally inconsistent because the jury had to believe Thiel or someone he aided and abetted operated the Triton in a "careless, reckless, or negligent manner." Thiel equates the jury's finding that he did not aid and abet in the reckless operation of the Triton with its conclusion that he "recklessly allowed the [Triton] to be operated in an unsafe manner." According to Thiel, for the jury to find he "recklessly allowed" his son to operate the Triton unsafely, it would necessarily need to find he aided and abetted another in operating the boat in a careless, reckless, or negligent manner. *See Doorenbos*, 2020 WL 3264408, at *4 (noting many inconsistent-verdict challenges involve offenses with overlapping elements).

As our case law recognizes, and the jury here was correctly instructed, a person aids and abets in the commission of a crime when they knowingly approve and agree to a "criminal act either by active participation or by some manner encouraging it prior to or at the time of its commission." *State v. Lilly*, 930 N.W.2d 293, 308 (Iowa 2019) (citation omitted); *see also State v. Allen*, 633 N.W.2d 752, 754 (Iowa 2001). In contrast, the word "allow" carries no precise legal definition and no explanation in the jury instructions. A legal dictionary's definition of "allow" identifies eleven different meanings. *See Allow*, Black's Law Dictionary (11th ed. 2019). Two notable definitions include the more-passive "[t]o put no obstacle in the way of; to suffer to exist or occur; to tolerate" and the more-active "[t]o give consent to; to approve." *Id.* A non-legal dictionary offers eight definitions, including "to let do or happen; permit," "to make provision for," and "to admit; grant." *See Allow*, American Heritage Dictionary 96 (2d college ed. 1985).

Despite this deluge of definitions, we need not choose one to the exclusion of all others. *State v. Ellison*, 985 N.W.2d 473, 482 (Iowa 2023) (words in a jury instruction need not be defined when they are not "beyond the lexicon of a reasonable juror"); *Thongvanh v. State*, 494 N.W.2d 679, 684 (Iowa 1993) (words do not require definition when they are "a term of common usage and readily understandable"). Even assuming jurors understood "allow" to carry a more-active meaning—that Thiel recklessly consented to, approved of, or permitted the reckless operation of the Triton—the jury could have concluded that fell short of the active participation or encouragement required to prove aiding and abetting. *See Lilly*, 930 N.W.2d at 308; *Allen*, 633 N.W.2d at 754. We are mindful that we need not delve into the facts in resolving an inconsistent-verdicts challenge. *See*

*Halstead*, 791 N.W.2d at 815. But we think the facts support our conclusion that the elements are not legally inconsistent. The jury here could have found both that Thiel did not actively participate in or encourage his son's recklessness (so he did not aid and abet) and that Thiel knew his son was operating the boat at a reckless speed and did nothing to stop him (so he permitted reckless operation). Because we can harmonize the verdicts, we reject Thiel's plea that we peer into "Pandora's box by probing into the sanctity of jury deliberations." *See id.*

We also find a second legal distinction between elements of the allegedly inconsistent manslaughter offenses: the required manner of operation. For the jury to find Thiel guilty of manslaughter by public offense, jurors had to find the Triton was operated "in a careless, reckless or negligent manner so as to endanger the life, limb or property of any person." But for Thiel to be convicted of manslaughter by conduct likely to cause death, the jury only had to find the vessel was operated in an "unsafe manner." Thiel asserts that "operating a boat in an 'unsafe manner' is the same as operating it carelessly or negligently." But Thiel cites no case law supporting this conclusion, did not argue it to the jury, and never requested an instruction to that effect. When we liberally construe the verdicts in search of harmony, we find the jury could have concluded Thiel's son operated the boat in an unsafe manner that was less than careless or negligent. *See Goodon*, 2020 WL 2060301, at *3 (on harmonizing verdicts). The verdicts were not legally inconsistent.

### D. Weight of the Evidence

Thiel concludes by contending the jury's verdict was "contrary to the weight of the evidence." *See* Iowa R. Crim. P. 2.24(2)(b)(6) (2021). When evidence

"preponderates heavily" against a verdict, the district court may grant a new trial to avoid a miscarriage of justice. *State v. Ellis*, 578 N.W.2d 655, 658–59 (Iowa 1998) (citation omitted). This standard requires the district court to "weigh the evidence and consider the credibility of witnesses." *Id.* at 658 (citation omitted). But on our review, we don't independently re-weigh evidence or judge a witness's credibility for ourselves—we review the district court's exercise of discretion, only reversing when a ruling rests on plainly untenable grounds or was clearly unreasonable. *State v. Taylor*, 689 N.W.2d 116, 134 (Iowa 2004).

Much of Thiel's argument on this ground is a repackaged challenge to the sufficiency of the evidence. He points to allegedly conflicting testimony and urges that the greater weight of credible evidence favored acquittal rather than conviction. In rejecting this claim below, the district court found:

> [T]his case was pretty clearly a credibility determination for the jury, and . . . they made their determination that the Thiel boat was being driven unsafely and in a manner likely to cause death or serious injury. That they found the conduct was reckless. And in addition to the subjective evidence of the witnesses that were presented, the jury also clearly found the objective evidence credible such as the GPS and speed information as well as to the damage of the boats. And so the Court finds that their finding is supported by the weight of the evidence.

Thiel offers no reason to believe this analysis was clearly unreasonable or untenable. While there was some conflicting evidence over whether the Triton was racing and whether the Bayliner crossed into the path of the Triton, every eyewitness other than those in the Triton or Scarab saw the Triton racing, and their accounts speak directly and colorfully to recklessness. Based on the uniformity among disinterested witnesses and the "objective evidence" described by the district court, this is not an "exceptional case[ ]" where "the evidence

preponderates heavily against the verdict." *Reeves*, 670 N.W.2d at 202 (citation omitted). The district court was in a better position than we are to assess credibility, and we discern no abuse of discretion in the new-trial ruling.

### III.    Disposition

We leave the error-preservation and waiver questions concerning inconsistent verdicts for another day and reject Thiel's challenges to his convictions on the merits.

**AFFIRMED.**